2016 IL App (1st) 140030
Fifth Division
March 4, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 89 CR 15497 |
| v. | ) ) | The Honorable |
| DARRYL CHRISTIAN, | ) ) | Diane Cannon, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal arises from a postconviction proceeding pursuant to the Illinois Torture Inquiry and Relief Commission Act (Act) (775 ILCS 40/1 *et seq.* (West 2010)). In 2011, defendant Darryl Christian filed a petition before the Torture Inquiry and Relief Commission (Commission), claiming that he had been tortured into confessing to the murder of his stepmother in 1989, a crime for which he was convicted and sentenced to 55 years in the Illinois Department of Corrections (IDOC), even though he claimed he was innocent. After reviewing defendant's petition, the Commission determined that sufficient evidence existed to warrant judicial review pursuant to the Act. Defendant's petition was assigned to a

judge in the circuit court of Cook County, where an evidentiary hearing occurred. After the evidentiary hearing, the circuit court found that there was no credible evidence that defendant was entitled to any relief on his torture claim and, accordingly, denied defendant's petition. Defendant appeals, raising an issue of first impression in this court, namely, whether the findings of the Commission are entitled to any preclusive effect before the circuit court. Alternatively, defendant argues that the circuit court's findings were against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                                  BACKGROUND

¶ 3       The instant appeal concerns a question of law about the effect of the Commission's findings, as well as review of the circuit court's finding that there was no credible evidence to support defendant's torture claim. The evidence before the circuit court included all of the prior court proceedings in defendant's case, so we set them forth here in order to properly analyze whether the circuit court's decision was against the manifest weight of the evidence. We provide only the detail that is necessary for resolution of the instant appeal.

¶ 4       In summary, in 1989, defendant was charged with first degree murder in connection with the death of his stepmother. After being arrested, defendant allegedly made a statement to a police detective and an assistant State's Attorney confessing to the crime. Defendant filed a motion to suppress the statement, claiming that the detectives interrogating him had struck him in the jaw and threatened to further abuse him if he did not confess. Defendant's motion to suppress was denied, and defendant was ultimately convicted of the murder and sentenced to 55 years in the IDOC. Defendant unsuccessfully filed a direct appeal, two postconviction petitions, and a petition for writ of *habeas corpus* before the federal district court. In 2011, defendant filed a claim of torture before the Commission. After conducting a formal inquiry,

2

the Commission concluded that there was sufficient evidence to merit judicial review and referred the claim to the circuit court for further consideration. The circuit court conducted an evidentiary hearing, after which it concluded that defendant was not entitled to any relief under the Act.

¶ 5                                I. Defendant's Arrest and Trial

¶ 6        On July 20, 1989, defendant was indicted for first degree murder in connection with the death of his stepmother on June 24, 1989. According to the police report,[1] Officer Roland Hunter was called to the scene by the Chicago fire department and, upon his arrival, was met by defendant. Defendant informed Hunter that he had left for work at 10 p.m. on June 23, 1989, and had returned home at approximately 10 a.m. and discovered his stepmother dead in the living room. Detective Michael Cummings also interviewed defendant, who told Cummings that he had been at a neighbor's house all night watching television with friends, arriving there between 10 and 11 p.m. on June 23 and leaving at 8 a.m. on June 24 to exercise in a nearby park, returning home at 10 a.m. and discovering his stepmother's body. Cummings interviewed the neighbors, one of whom stated that defendant came to his home between 10 and 11 p.m. and smoked cocaine with the neighbor and the neighbor's sister until 2 to 2:30 a.m., at which point defendant left.

¶ 7        According to the police report, defendant agreed to accompany Cummings to Area 2 Violent Crimes headquarters to be questioned further. Cummings read defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), which defendant said he understood. Defendant chose to speak with Cummings and confessed to Cummings that he had killed his stepmother during an argument. Defendant told Cummings that he and his stepmother had

---

[1] The parties stipulated to the admission of the police report during the evidentiary hearing before the circuit court on defendant's torture claim.

argued because she wanted him to move out because he was not doing any chores around the house. Defendant stated that he was not leaving and his stepmother said that she would force him out, going to the kitchen and obtaining a large kitchen knife. Defendant grabbed her wrist and removed the knife from her hand, then began stabbing her. He pushed her away and she fell to the floor. Defendant dropped the knife and left. Defendant later returned to the house and retrieved the knife and also kicked out the basement window to make it look like someone had broken into the house. Defendant drove away and threw the knife into some bushes while he was driving, then drove back home and called the police. Before the police arrived, he removed his bloodied gym shoes and hid them under the rear porch.[2]

¶ 8    According to the police report, after giving that account, defendant was placed under arrest and the felony review unit of the State's Attorney's office was notified. Assistant State's Attorney (ASA) Dave Fischer interviewed defendant, who gave him a written statement.

¶ 9    Defendant's statement stated, in relevant part:

"Darryl said that he'd been down the block watching TV with his friends when he decided to go home. He went to his home and got into an argument with his mother;[3] she wanted him to leave because he did not do housework that she thought he should do. Darryl said that he refused to leave, and the argument continued. His mother went into the kitchen and got a large knife; she then came back to where they'd been arguing. Darryl took the knife from his mother, stabbed her once with it, and pushed her away. She fell to the floor, and the knife was dropped beside her.

---

[2] The knife was never recovered, but a pair of gym shoes was recovered from underneath the rear porch. The parties stipulated that the gym shoes had human blood on them.

[3] The victim is referred to both as defendant's stepmother and as his mother throughout the record. According to his presentence investigation report, defendant stated that he had been adopted by the victim and her husband, and that defendant's adoptive father passed away in 1974.

Darryl said that he then left the house, returned for a while to his friend's house down the street, and then went walking. He returned to the house he'd shared with his mother around 9:30 and took her car for a ride, throwing the knife he'd stabbed her with into weeds at 76th St. and South Chicago. Darryl also broke a window at the house and then called the Chicago police.

Darryl is 33 years old and received his G.E.D. in the United States Army. He reads, writes, and speaks English. Darryl has been well treated while in police custody. Det. Cummings has given him cigarettes and lunch and coffee. No one has threatened Darryl nor promised him anything in return for this statement. Darryl appears and sounds free from alcohol and drugs and tells us that he is in fact sober and in control of his thoughts at this time. Darryl has told us that he is sorry about what happened between himself and his mother last night."

¶ 10    Prior to trial, defendant filed a motion to suppress the statement he had allegedly made confessing to the crime, claiming, *inter alia*, that "the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against the defendant and that such statements were, therefore, involuntary in violation of the 5th and 14th Amendments to the United States Constitution." Specifically, the motion claimed that "[defendant] was hit by one of the *** Detectives."

¶ 11    At the suppression hearing, ASA Fischer testified that on June 24, 1989, he was working in the felony review unit at the State's Attorney's office and was called to Area 2 to speak with Detective Cummings. After he spoke with Cummings, he reviewed paperwork and then had a conversation with defendant in an interview room. Fischer entered the room with Cummings and observed defendant sitting on a bench in the interview room. Fischer

introduced himself, explaining that he was an attorney with the State's Attorney's office and did not represent defendant. He then advised defendant of his *Miranda* rights, which defendant stated he understood. Defendant then spoke to Fischer about the crime for approximately 15 minutes. At the end of that conversation, Fischer asked defendant whether he wished to have a court reporter take his statement or if he would rather have a summarized statement written by Fischer. Defendant chose the written statement, so Fischer and Cummings left the interview room and Fischer drafted a three-page summary of defendant's confession.

¶ 12     After he had drafted the statement, Fischer and Cummings returned to the interview room, where Fischer showed the draft to defendant. While Fisher had previously established that defendant had obtained a GED, he nevertheless asked defendant to read the beginning of the document out loud, which defendant did. Defendant then signed the written *Miranda* warnings at the beginning of the document and was asked to read the rest of the statement silently. On the second page, defendant pointed out that there was an incorrect time written in the summary, so Fischer corrected the time and Fischer, Cummings, and defendant initialed the correction. After defendant had finished reviewing the statement, Fischer, Cummings, and defendant signed each page of the statement. When Fischer and Cummings were exiting the interview room, Fischer waved Cummings away and stuck his head back into the interview room to ask defendant if everything was all right; defendant responded that it was. Fischer testified that he had also asked defendant if everything was all right prior to taking his statement and defendant responded that it was.

¶ 13     Fischer testified that at no time did he or anyone in his presence strike defendant or use any type of physical coercion on him. Fischer also observed defendant eating a lunch from

McDonald's. Fischer further testified that he did not observe any injuries on defendant and that defendant did not ask him for medical attention.

¶ 14      Detective Lawrence Nitsche testified at the suppression hearing that on June 24, 1989, he was employed as a detective in the Chicago police department, assigned to Area 2 Violent Crimes. He was assigned to investigate the victim's homicide and arrived at the scene at approximately 12:15 p.m. He observed the crime scene for 10 to 15 minutes, then left with defendant and Detective Cummings in an unmarked police vehicle and returned to Area 2 headquarters. They returned to Area 2 about 10 to 15 minutes later and defendant was placed in an interview room on the second floor, after which Nitsche began working on paperwork for an unrelated assignment. Nitsche did not have any contact with defendant until approximately 4:15 p.m. when he assisted Cummings in escorting defendant to the lockup. Nitsche testified that neither he nor anyone in his presence struck defendant.

¶ 15      Detective Cummings testified at the suppression hearing that on June 24, 1989, he was a detective assigned to Area 2 Violent Crimes and at approximately 11:30 a.m. received an assignment to investigate the victim's homicide. When he arrived, he observed the scene, spoke to the beat officer, and spoke with defendant. He also spoke with some other individuals living nearby, after which he returned to the scene and asked defendant to accompany him to Area 2; they left at approximately 12:30 p.m., along with Detective Nitsche. When they arrived at Area 2 at approximately 12:45 p.m., he and Nitsche escorted defendant to the second floor and Cummings asked defendant to sit in one of the interview rooms. A few minutes later, Cummings entered the interview room where defendant was sitting and advised him of his *Miranda* rights, which defendant indicated that he understood. Defendant and Cummings then had a conversation for approximately 10 minutes, after which

Cummings told defendant he was under arrest, left the room, and called the felony review unit of the State's Attorney's office. While they were waiting for the felony review unit, Cummings gave defendant coffee, smoked a cigarette with him, and took him to the bathroom. He asked defendant if he was hungry and when defendant responded that he was, Cummings gave defendant a lunch purchased from McDonald's.

¶ 16      Cummings testified that ASA Fischer arrived at approximately 1:30 p.m., and they both went into the interview room. Fischer introduced himself to defendant and again advised defendant of his *Miranda* rights, which defendant stated he understood. Defendant then had a conversation with Fischer for approximately 5 to 10 minutes, then Fischer asked defendant whether he would be willing to give a handwritten or court-reported statement. Defendant stated that he wished to provide a handwritten statement and Cummings and Fischer left the room and Fischer wrote out the statement. Cummings and Fischer then reentered the interview room at approximately 2:15 p.m. and gave the statement to defendant. Fischer asked defendant to read the heading and *Miranda* warnings out loud, which defendant did. Defendant then continued reading the statement and pointed out an error, which Fischer corrected, and all three initialed the correction. After defendant finished reviewing the statement, he, Fischer, and Cummings all signed each page. Fischer and Cummings then left the room, and Fischer motioned Cummings away and stuck his head back into the interview room. Cummings testified that he and Fischer were the only ones who ever entered the interview room and that neither he nor anyone in his presence ever struck defendant in any manner.

¶ 17    The trial court denied defendant's motion to suppress, finding that "he was not in fact physically coerced in any way. He was not beaten, hit, kicked or whatever by any of the police officers or by the assistant state's attorney."

¶ 18    The matter proceeded to a jury trial, where defendant was convicted of first degree murder and was sentenced to 55 years in the IDOC. At trial, ASA Fischer testified consistently with his testimony at the suppression hearing. Officer Hunter testified consistently with the account stated in the police report that defendant had informed him that he had been at work from 10 p.m. on June 23 until 10 a.m. the following morning. Detective Cummings also testified consistently with the account stated in the police report and with his testimony at the suppression hearing. Defendant did not present any evidence and did not testify on his own behalf.

¶ 19                                II. Prior Appeals

¶ 20    Defendant appealed his conviction, arguing that (1) the trial court abused its discretion by failing to ask prospective jurors two questions about defendant's drug use and the victim's age; (2) the prosecutor made improper remarks during rebuttal argument which deprived defendant of a fair trial; and (3) the trial court erred in denying defendant's motion for a new trial based on ineffective assistance of counsel. *People v. Christian*, No. 1-91-0758, at 1 (1993) (unpublished order under Supreme Court Rule 23). We affirmed the trial court's judgment. *Christian*, No. 1-91-0758, at 1.

¶ 21    With respect to defendant's argument concerning improper remarks during rebuttal argument, defendant argued that "the prosecutor made improper rebuttal to defense counsel's argument that the defendant's confession was induced by police coercion." *Christian*, No. 1-91-0758, at 4. We rejected defendant's argument, finding that "[w]ithin the context of the

trial as a whole, the prosecutor's comments do not represent remarks so prejudicial that defendant's fundamental right to a fair trial was violated. The strongest evidence against defendant was his signed statement. The circumstances surrounding the statement do not hint of police abuse. The defendant voluntarily went to the police station, ate lunch one hour later, and signed a statement within the next hour. When asked, defendant stated he was free from drugs and alcohol and did not complain to Assistant State's Attorney Fischer about mistreatment by the police. Most importantly, defense counsel failed to offer any evidence of police abuse. He only argued police abuse in closing argument." *Christian*, No. 1-91-0758, at 5.

¶ 22    With respect to defendant's ineffective assistance of counsel claims, defendant argued that trial counsel should have called alibi and character witnesses to testify on his behalf. *Christian*, No. 1-91-0758, at 5. We rejected defendant's argument, finding that defense counsel's decisions were matters of trial strategy, and noting that "[i]n this case, defense counsel interviewed Tiwana Alexander, an alleged alibi witness, and the trial judge was aware of the interview. Ms. Alexander was also available during the trial. Yet, defense counsel chose not to call her as a witness. Defense counsel further chose not to call character witnesses. Decisions whether character and alibi witnesses will be called are matters which defense counsel must decide for every trial as a part of strategy. We believe that the trial court understood these matters clearly pertained to trial strategy." *Christian*, No. 1-91-0758, at 6.

¶ 23    On February 15, 1994, defendant filed a *pro se* postconviction petition, which was dismissed by the trial court at the first stage. On appeal, defendant's appointed counsel filed a motion for leave to withdraw as appellate counsel and filed a brief in support of the motion

pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), in which appellate counsel stated that he had reviewed the trial record and concluded that there were no arguable bases for collateral relief. *People v. Christian*, No. 1-94-1595, at 1-2 (1995) (unpublished order under Supreme Court Rule 23). After reviewing the record and the briefs, we found no issues of arguable merit and, consequently, permitted appointed counsel to withdraw and affirmed the judgment of the trial court. *Christian*, No. 1-94-1595, at 2.

¶ 24    On July 24, 1997, defendant filed a petition for writ of *habeas corpus* in the federal district court, in which he claimed that his "involuntary confession to the police on June 24, 1989 was in violation of his fifth amendment right to the federal constitution and therefore the confession should have been suppressed." On April 7, 1998, defendant's petition was denied by the district court.

¶ 25    On October 17, 2003, defendant filed a *pro se* successive postconviction petition, which was supplemented on November 1, 2006, after appointment of counsel. One of the claims in the successive petition was that defendant was entitled to an evidentiary hearing regarding police misconduct that coerced his confession, because the state of the law had changed since defendant's trial and there was newly discovered evidence. The successive petition claimed that since the appellate court decision on defendant's first postconviction petition, there was new case law concerning police brutality claims at Area 2, citing *People v. Patterson*, 192 Ill. 2d 93 (2000), and *People v. Cannon*, 293 Ill. App. 3d 634 (1997); defendant's *pro se* petition also referred to an Office of Professional Standards (OPS) report finding a systemic practice of torturing suspects at Area 2. The petition also pointed to two appellate court decisions in which the conduct of detectives Cummings and Nitsche had been at issue. The petition argued that "[b]ased upon petitioner's sworn assertions against Cummings and Nitsche,

changes in applicable law, and [the] backgrounds of Cummings and Nitsche at Area Two, a new hearing on the voluntariness of the confession attributed to petitioner is now needed." Defendant's petition was dismissed at the second stage. On appeal, defendant's appointed counsel filed a motion for leave to withdraw as appellate counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and we granted counsel's motion and affirmed the trial court. *People v. Christian*, No. 1-07-2482 (2009) (unpublished order under Supreme Court Rule 23).

¶ 26                                        III. Torture Claims Under the Act

¶ 27                                        A. Commission Proceedings

¶ 28        On May 2, 2011, defendant filed a claim of torture before the Commission. Defendant claimed that on June 24, 1989, "I was struck extremely hard in the face, dazed and confused while being screamed at to give a false confession to the [assistant] States Attorney, and threaten[ed] [that] if I did not do it, the abuse would continue. So I gave the false statement to end the abuse. *Which is the only evidence used to convict me. I am an innocent man falsely incarcerated.*" (Emphasis in original.)

¶ 29        On June 13, 2012, the Commission issued its case disposition, which stated that "it is the decision of the Commission that, by a preponderance of the evidence, there is sufficient evidence of torture to conclude the Claim is credible and merits judicial review for appropriate relief." The Commission stated that its decision was based on the following findings of fact.

¶ 30                                        1. Commission's Findings of Fact

¶ 31        On June 24, 1989, defendant telephoned the Chicago police and ambulance from his stepmother's home and stated that he had arrived at the home and discovered that she had

been stabbed to death. Area 2 detectives Michael Cummings and Lawrence Nitsche were among the police personnel responding to the scene; while Jon Burge had been transferred from Area 2 to Area 3 the year before, the detectives had worked at Area 2 while Burge was there. While at the scene, defendant was questioned concerning his activities prior to discovering the body and was then taken to Area 2 after being informed that the people he mentioned did not support his account. "During the questioning of [defendant] at Area 2, the Detectives screamed and yelled at [defendant], and Cummings struck [defendant] very hard in the face. [Defendant] was also threatened with further beatings if he did not agree to confess." Defendant signed a three-page confession written by an ASA and was later indicted for the murder of his stepmother in the circuit court of Cook County.

¶ 32    Defendant filed a motion to suppress his confession, "alleging that he was struck and confessed as a result." Although he swore to the contents of the motion, defendant was not called as a witness at the hearing, nor did the defense present any other witnesses or evidence in support of the motion. The ASA who had taken defendant's statement testified at the hearing that within a period of 45 to 60 minutes after arriving at Area 2, he was briefed by the detectives about the case; interviewed defendant, who orally confessed; wrote up the confession from memory because he had not taken any notes; and reviewed the written confession with defendant, which was then corrected and signed.

¶ 33    According to the Commission:

"Since the motion to suppress was heard, the following evidence has emerged:

a. In 1990 the Office of Professional Standards of the Chicago Police Department concluded after an internal investigation that there had been systemic

abuse at Area 2 for over 10 years. The Report was not released publicly until 1992.

b. On November 12, 1991, Jon Burge was suspended, and on February 11, 1993, the Police Board of the City of Chicago separated him from his position as a Commander with the Department of Police after finding him guilty of abusing Andrew Wilson at Area 2 in 1982.

c. In 2002 Chief Cook County Criminal Court Judge Paul Biebel appointed a Special State's Attorney to investigate allegations of torture by police officers under the command of Burge at Areas 2 and 3 to determine if any criminal prosecutions were warranted. Although the 2006 Report concluded that the statute of limitations barred any criminal prosecutions, the Report found that '[t]here are many other cases which lead us to believe that the claimants were abused'. [Citation.] On the occasion of the Report's release, the Special State's Attorney stated that he believed the abuse was an 'ongoing' practice, and had occurred in approximately half of the 148 cases which were investigated. [Citation.]"

¶ 34       At trial, "the prosecution's case against [defendant], apart from the confession, was very weak." The Commission pointed to the appellate court order affirming defendant's on direct appeal, in which we noted that " '[t]he strongest evidence against defendant was his signed statement.' " (quoting *People v. Christian*, No. 1-91-0758 (1993) (unpublished order under Supreme Court Rule 23)). The Commission also specifically noted that it was "not finding that [defendant] is necessarily factually innocent of the offense, only that the weakness of the case against [defendant] gave added incentive to coerce a confession to bolster that case." The Commission noted that there were no eyewitnesses to the offense; the murder weapon

14

was not recovered; and the only physical evidence of note was a pair of gym shoes recovered from under the front porch, which had a small amount of blood on the outside of the left heel. Although the serology analysis was able to classify it as human blood, it was not identified as the blood of either the victim or defendant, and the shoes were not even identified as defendant's other than through the confession. Defendant did not testify at trial and the defense presented no evidence on his behalf.

¶ 35     The Commission found that there were "major inconsistencies between the confession and other evidence in the case." For instance, the confession did not mention the gym shoes; the confession stated that defendant stabbed the victim one time, but the medical examiner's report stated that she was stabbed 24 times; and the confession stated where the murder weapon was supposedly left but the police did not recover the knife, even though the confession was made only about 14 hours after the murder occurred. The Commission also found that "[t]here is a question whether the police even tried to recover [the murder weapon]. Although the police testified at trial that they did, none of the police reports document any attempt to do so."

¶ 36     The Commission also found that "[t]here [were] other problems with the prosecution's case." The police took custody of the clothes defendant was wearing at the house, but there was no blood on them even though the victim was stabbed 24 times and there was testimony she was discovered lying in a pool of blood; the clothes were also not introduced at the trial. The Commission noted that "[a]lthough [defendant] could have changed his clothes after committing the stabbing, the confession makes no mention of this." The Commission further noted that the confession stated that defendant broke a window in the basement to make it look like an intruder committed the murder, but there was no blood or glass in the victim's

vehicle, although the confession stated that defendant drove the vehicle afterward to the spot where he said he threw the knife, and there was also no blood on the glass from the basement window.

¶ 37     The Commission found that at the sentencing hearing, defendant spoke for the first time in the entire case and challenged the prosecution's theory that he stabbed the victim because he was angry that she wanted him to move out because he was not doing housework. Defendant stated that he had not been angry or argued with the victim and had in fact paid for her funeral and burial expenses himself. The Commission noted that "[a]lthough that statement was not investigated or corroborated at the time, the [Commission's] investigation has revealed that [defendant] did pay the sum of $2,198.00 for funeral and burial expenses." The Commission found that "[a]lthough it could be argued that [defendant] paid out of guilt and remorse for what he had done, this is a very large sum of money in 1989 for somebody in [defendant's] economic situation who was in jail to boot. It seems highly unlikely that somebody who had done what [defendant] was convicted of doing would be bothered so much by guilt and remorse that he would pay a funeral bill of that amount."

¶ 38     The Commission found that defendant presented a version of the same coercion claim he was making before the Commission in his first *pro se* postconviction petition filed in 1994, in which he argued that the use of an involuntary confession violated due process and that his confession was contradicted by other evidence in the case. The Commission noted that the petition was denied on procedural grounds without reaching the merits of the argument. Defendant presented the claim again more fully in his second *pro se* postconviction petition filed in 2003, citing the Office of Professional Standards reports and the decisions of the Illinois Supreme Court in *People v. Patterson*, and the Illinois Appellate Court in *People v.*

*Cannon*. The *pro se* petition was later supplemented by a petition filed by appointed counsel, but these were also dismissed on procedural grounds without an evidentiary hearing and without reaching the merits of the claim.

¶ 39                                                       2. Commission's Conclusions

¶ 40        Based on the above findings of fact, the Commission found that "[t]his Claim exhibits many of the standard characteristics of coerced, false confession cases. The confession itself is very cursory in nature: it only totals three pages, including the advice of rights, and only a little over one page even relates to the facts of the case. The testimony of the ASA concerning the manner in which the confession was obtained is far from convincing. The confession omits any reference to important facts, such as the gym shoes, and conflicts with others, such as the number of times the victim was stabbed."

¶ 41        The Commission further found that "[t]he prosecution's case without the confession is almost nil. There were no eyewitnesses. There was no physical evidence other than the gym shoes, and the small amount of blood on them was not linked to either the victim or [defendant]. There was no blood on [defendant's] clothing."

¶ 42        The Commission found that "[t]he quality of [defendant's] legal representation was very poor. For no apparent reason, [defendant] did not testify at the hearing on the motion to suppress and no other evidence was introduced, so other than cross-examination there was nothing presented to support the motion. [Defendant] did not testify at trial and no evidence was introduced on his behalf. There is no indication that any investigation was conducted to discover exculpatory evidence, such as the funeral home information. This was obtained over 20 years later, indicating that a contemporary investigation would likely have produced additional exculpatory evidence."

17

¶ 43    The Commission noted that "[defendant] has consistently asserted his coercion Claim from the time of his motion to suppress, which was filed in February of 1990, through his present filing with the [Commission] in May, 2011."

¶ 44    The Commission concluded that "the Claim is credible based upon a preponderance of the evidence, and merits judicial review for consideration of appropriate relief."

¶ 45                        B. Circuit Court Proceedings

¶ 46    On June 20, 2013, defendant filed a petition for relief under the Act based on the Commission's finding that defendant's claims of torture were credible, which he supplemented on July 1, 2013, with the legislative history of the Act.

¶ 47    Prior to the hearing on defendant's petition, defendant gave a discovery deposition, in which he testified that both detectives Cummings and Nitsche interrogated him, with "a lot of accusations, screaming and hollering, and profanity, accusing me of it." Defendant denied committing the crime and "after a while—it's been like maybe a few hours going backwards and forth with the bickering, hollering and screaming. I just shut up. It was like around maybe 10 or 15 minutes after that, they were still hollering and then bam. Cummings hit me. And then I just dropped my head." He testified that Cummings told him that "you better tell [the ASA] that you did this," and "went to go do it again, threatening." When the ASA entered the room, defendant told the ASA "[y]eah, I did it," and the ASA and the detectives left. Defendant testified that the bulk of the statement was fabricated and "I didn't say anything like that."

¶ 48    The circuit court conducted an evidentiary hearing on defendant's torture claim on October 9, 2013. Defendant testified on his own behalf that he was incarcerated for the first degree murder of his stepmother. Defendant testified that on the morning of June 24, 1989,

he came home from spending the night at a friend's house and discovered the victim lying on the floor in a pool of blood. It appeared that she was not breathing, so defendant "[i]mmediately" called the police and paramedics. A short time after the police and paramedics arrived, detectives Cummings and Nitsche also arrived on the scene. The two detectives took defendant to the kitchen and asked defendant where he had been overnight. Defendant explained that he had been up the street at his friend's house, and the detectives left. The detectives returned approximately 10 to 15 minutes later, telling him that they had spoken with his friend, who denied that defendant had been there. The detectives asked defendant why he was lying to them, which defendant denied, and they placed defendant in handcuffs.

¶ 49       After defendant was placed in handcuffs, he was placed in a police vehicle and driven to Area 2 headquarters, where he was taken to a small room and handcuffed to a ring on the wall. When the detectives returned a few minutes later "it was like *** their whole demeanor had changed." The detectives screamed at defendant and accused him of committing the crime for 45 minutes to an hour, after which Detective Cummings "reared back and he hit me, he hit me so hard I almost passed out." The detectives then continued with their accusations and Cummings informed defendant that "a guy outside [in] the hall is a state's attorney and if you don't tell him you did this it will continue." Defendant testified that by "it," he understood the detective to mean "[t]he beating."

¶ 50       Defendant testified that a man then entered the room and identified himself as working in the State's Attorney's office. Defendant confirmed to the ASA that he was able to read and write and had a GED. The ASA asked defendant what had happened, and defendant "looked up, and [the detectives] were just standing there behind him." Defendant informed the ASA

"yeah, I did it," and everyone left the room, returning approximately 20 to 30 minutes later with some papers that they instructed defendant to sign. Defendant testified that he had never described the situation written up in the papers as his statement to either the detectives or to the ASA. Defendant admitted to signing the statement, but testified that he was not given the opportunity to read it over and was not advised of his *Miranda* rights. Defendant testified that he would not have signed the statement if he had not been hit by the detective.

¶ 51    Defendant testified that he was held in Area 2 for over four hours, during which time he had not been given anything to eat or drink, had not been given an opportunity to use the washroom, and had not been given any cigarettes to smoke.

¶ 52    On cross-examination, defendant admitted that his attorney had filed a motion to suppress defendant's statement on February 26, 1990, but that the motion did not claim that the detectives had threatened defendant for over an hour. However, his motion to suppress did claim that defendant had been hit by one of the detectives, but did not specify where. Defendant further admitted that he had filed a direct appeal of his conviction, which did not challenge his statement as being the product of coercion, but testified that he had not reviewed the appellate brief and had no "say-so in what they file. It was just sent to me after the fact." Defendant also admitted that his postconviction petition had no allegations concerning the detectives threatening him or hitting him, nor did the petition for a writ of *habeas corpus* that he filed in federal court. On redirect examination, defendant testified that his postconviction petition and petition for writ of *habeas corpus* included allegations that his confession was involuntary. Defendant also admitted on cross-examination that he had written several letters to the then-State's Attorney indicating that some individuals in the IDOC had fabricated torture claims.

¶ 53        Defendant also testified that he never testified before the Commission and did not call any witnesses before the Commission, nor was he present for any such hearing. Defendant testified that the proceeding before the circuit court was the first time he had appeared in court since his 1990 trial.

¶ 54        After defendant's testimony, the circuit court admitted the following defense exhibits into evidence: (1) a notice of filing and certificate of service of the Commission's findings; (2) defendant's written statement; (3) a copy of the medical examiner's postmortem report; (4) four crime scene photos; (5) the police report completed by detectives Cummings and Nitsche, to which the State stipulated; (6) defendant's written allocution at the time he was sentenced; and (7) a copy of every postconviction petition filed by defendant. The defense then rested.

¶ 55        In the State's case in chief, Fischer, the former ASA who had taken defendant's statement, testified that in June 1989, he was an ASA assigned to the felony review unit. On June 24, 1989, at approximately 12:30 or 1 p.m., he received an assignment to go to Area 2 and speak with Detective Cummings. When he arrived at Area 2, he spoke with Detective Cummings, reviewed some reports, and then went to an interview room to speak with defendant; defendant, Cummings, and Fischer were the only individuals present in the room. Fischer introduced himself to defendant and read defendant his *Miranda* rights, which defendant indicated he understood. Fischer then asked defendant whether he wanted to discuss the case, and defendant gave him a verbal statement. Fischer then left the room and drafted a written summary of defendant's statement; the initial meeting with defendant took approximately 10 to 15 minutes. When he finished writing the summary, Fischer again met with Detective Cummings, who accompanied him into the interview room.

¶ 56    Fischer gave defendant the written summary that Fischer had prepared, and asked him to read it and make any corrections that were necessary. He asked defendant to read the beginning of the statement out loud in order to verify defendant's literacy, which he did. Fischer identified a copy of the written statement, which had his, defendant's, and Detective Cummings' signatures on it. Fischer also identified an area of the statement in which defendant had made a correction; he testified that defendant brought the error to his attention and he struck out the incorrect language and inserted the correct language. Fischer testified that all of the information contained within the statement came from defendant.

¶ 57    Fischer testified that Detective Cummings had taken McDonald's food in to defendant prior to Fischer's meeting with defendant. He further estimated that he was standing three to five feet from defendant and did not notice any bruising or marks on defendant's face. After Fischer spoke with defendant, Detective Cummings left the room and once he was out of earshot, Fischer asked defendant whether "everything [was] all right" and defendant made a positive verbal response.

¶ 58    Fischer testified that he had testified as to the circumstances surrounding the statement both at the hearing on defendant's motion to suppress and at defendant's trial. He confirmed that his testimony at both of those proceedings was truthful and accurate. Fischer testified that he had not been contacted by the Commission concerning defendant's torture claim.

¶ 59    After Fischer's testimony, the circuit court admitted the following State exhibits into evidence, all of which were admitted without objection: (1) defendant's written motion to suppress his statement; (2) defendant's direct appeal; (3) defendant's 1994 postconviction petition; (4) defendant's 1997 petition for writ of *habeas corpus* filed in federal court; (5) defendant's statement; (6) and (7) November 2005 correspondence between defendant and

the then-Cook County State's Attorney; (8) a transcript of Fischer's testimony at defendant's suppression hearing; (9) a transcript of Detective Nitsche's testimony at defendant's suppression hearing; (10) a transcript of Detective Cummings' testimony at defendant's suppression hearing; (11) a transcript of Fischer's trial testimony; (12) defendant's torture claim form that was filed with the Commission on May 2, 2011; and (13) a transcript of defendant's September 17, 2013, deposition concerning his torture claims. The State then rested.

¶ 60       On November 25, 2013, the circuit court denied defendant relief on his torture claim. The court's order provided:

> "This court finds there is absolutely no credible evidence that Darryl Christian is entitled to any relief whatsoever on his claim of torture.
>
> Darryl Christian gave four different versions of his actions with regard to the murder of Lottie Anderson prior to being charged. He testified under oath he never made the statement he signed. No credible evidence exists that Mr. Christian was ever slapped before he gave his final version of the events leading up to the murder. It should be noted that final statement made by Mr. Christian minimizes his actions.
>
> Any relief would be a miscarriage of justice. Based on the evidence heard and received, relief is denied."

This appeal follows.

¶ 61                                           ANALYSIS

¶ 62       On appeal, defendant raises an issue of first impression in this court, namely, whether the findings of the Commission are entitled to any preclusive effect before the circuit court.

23

Alternatively, defendant argues that the circuit court's findings were against the manifest weight of the evidence.

¶ 63                            I. Effect of the Commission's Findings

¶ 64       We first consider defendant's arguments concerning the effect of the Commission's findings on the circuit court, an issue of first impression before this court. Defendant argues that the Commission's findings are granted preclusive effect based on the doctrines of collateral estoppel and law of the case. In order to analyze this issue, it is first necessary to discuss the Act and its provisions.

¶ 65                         A. Torture Inquiry and Relief Commission Act

¶ 66       The Act became law on August 10, 2009, and took effect the same day; it has not been amended since its enactment. 775 ILCS 40/99 (West 2010). The purpose of the Act is to "establish[] an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." 775 ILCS 40/10 (West 2010). Under the Act, a " '[c]laim of torture' means a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence related to allegations of torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge." 775 ILCS 40/5(1) (West 2010). The Act applies to claims of torture filed not later than August 10, 2014—five years after the effective date of the Act. 775 ILCS 40/70 (West 2010).

¶ 67       The Act established the Commission, which is an independent commission under the Illinois Human Rights Commission for administrative purposes. 775 ILCS 40/15(a) (West 2010). The Commission consists of eight voting members: one is to be a retired circuit court

24

judge, one is to be a former prosecuting attorney, one is to be a law school professor, one is to be engaged in the practice of criminal defense law, one is to be a former public defender, and three are to be members of the public who are not attorneys and are not officers or employees of the judicial branch. 775 ILCS 40/20(a) (West 2010). The members of the Commission are appointed by the governor, with the advice and consent of the senate, for three-year terms. 775 ILCS 40/20(a), 25(a) (West 2010). The Commission's duties include establishing the criteria and screening process to be used to determine which cases are accepted for review by the Commission; to conduct inquiries into claims of torture; to coordinate the investigation of cases accepted for review by the Commission; and "[t]o prepare written reports outlining Commission investigations and recommendations to the trial court at the completion of each inquiry." 775 ILCS 40/35 (West 2010).

¶ 68    A claim of torture may be referred to the Commission by any court, person, or agency. 775 ILCS 40/40(a) (West 2010). The Commission may, in its discretion, either informally screen and dispose of a case summarily or grant a formal inquiry of the claim. 775 ILCS 40/40(a) (West 2010). The Commission may only conduct a formal inquiry if the convicted person first signs an agreement waiving his or her procedural safeguards and privileges, including the right against self-incrimination; agrees to cooperate with the Commission; and agrees to provide full disclosure regarding inquiry requirements of the Commission. 775 ILCS 40/40(b) (West 2010). If a formal inquiry regarding the torture claim is granted, the Commission's director shall use all due diligence to notify the victim, explain the inquiry process, and notify the victim that he or she has the right to present his or her views or concerns throughout the Commission's investigation. 775 ILCS 40/40(c) (West 2010).

¶ 69    In conducting its inquiry, the Commission "may use any measure provided in the Code of Civil Procedure and the Code of Criminal Procedure of 1963 to obtain information necessary to its inquiry." 775 ILCS 40/40(d) (West 2010). The Commission may also issue subpoenas or other process to compel the attendance of witnesses and the production of evidence; administer oaths; petition the circuit court for enforcement of process or for other relief; and prescribe its own rules of procedure. 775 ILCS 40/40(d) (West 2010).

¶ 70    At the completion of the Commission's inquiry, the director reports the results and his or her recommendation to the full Commission. 2 Ill. Adm. Code 3500.375(i), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011).[4] The director's written report is to summarize all the relevant evidence, include the reasons for the recommendation, and present any other matters necessary for the Commission to make an informed decision regarding the claim. 2 Ill. Adm. Code 3500.375(i), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). After "all relevant evidence" is presented to the full Commission, the Commission may, in its discretion, conduct a hearing. 775 ILCS 40/45(a) (West 2010).

¶ 71    At the hearing, "all relevant evidence from the formal inquiry shall be presented to the full Commission in summary form as part of the Director's report and recommendation." 2 Ill. Adm. Code 3500.380(a)(1), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). The director shall also present any additional evidence the Commission has elected to consider, unless the Commission orders otherwise. 2 Ill. Adm. Code 3500.380(a)(2), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011).

¶ 72    After the hearing, the full Commission votes "to establish further case disposition." 775 ILCS 40/45(c) (West 2010). "If 5 or more of the 8 voting members of the Commission

---

[4] The Act's regulations have been amended once. 38 Ill. Reg. 18988 (eff. Sept. 19, 2014). However, we cite the regulations that were in effect at the time of defendant's torture claim and the Commission's disposition of that claim.

conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the case shall be referred to the Chief Judge of the Circuit Court of Cook County by filing with the clerk of court the opinion of the Commission with supporting findings of fact, as well as the record in support of such opinion, with service on the State's Attorney in non-capital cases and service on both the State's Attorney and Attorney General in capital cases." 775 ILCS 40/45(c) (West 2010). "If less than 5 of the 8 voting members of the Commission conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the Commission shall conclude there is insufficient evidence of torture to merit judicial review. The Commission shall document that opinion, along with supporting findings of fact, and file those documents and supporting materials with the court clerk in the circuit of original jurisdiction, with a copy to the State's Attorney and the chief judge."[5] 775 ILCS 40/45(c) (West 2010).

¶ 73        With respect to postcommission judicial review, the Act provides: "If the Commission concludes there is sufficient evidence of torture to merit judicial review, the Chair of the Commission shall request the Chief Judge of the Circuit Court of Cook County for assignment to a trial judge for consideration. The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing. Notwithstanding the status of any other postconviction proceedings relating to the petitioner, if the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge, or for such relief as may be granted under a petition for a certificate of

---

[5] According to the Commission's website, it has received over 200 claims. State of Illinois Torture Inquiry and Relief Commission, Mission and Procedure Statement, http://www.illinois.gov/tirc/Pages/default.aspx (last visited Mar. 1, 2016).

innocence, as may be necessary and proper." 775 ILCS 40/50(a) (West 2010). The State's Attorney or the State's Attorney's designee shall represent the State at the hearing before the assigned judge. 775 ILCS 40/50(b) (West 2010).

¶ 74    The Act provides that, "[u]nless authorized by this Act, the decisions of the Commission are final and are subject to review as final decisions under the provisions of the Administrative Review Law, and shall only be overturned if the court finds that they are against the manifest weight of the evidence." 775 ILCS 40/55(a) (West 2010). In the case at bar, the State did not appeal the Commission's findings.

¶ 75                    B. Preclusive Effect of the Commission's Findings

¶ 76    As noted, on appeal, defendant argues that the Commission's findings of fact must be given preclusive effect under the doctrines of collateral estoppel and law of the case. We note that the Act has never been interpreted by any court in this State, so our analysis on this issue is a matter of first impression.[6]

¶ 77    In the case at bar, defendant primarily argues that "[u]nder the collateral estoppel doctrine, the state is precluded from re-litigating issues that have been determined by a final and valid judgment and thus the court may not revisit the finding by the [Commission] that the Defendant was tortured." As an initial matter, it is important to clarify exactly what the Commission found. In his brief, defendant repeatedly states that the Commission found that he was tortured by the police officers. However, the Commission actually found only that "there is sufficient evidence of torture to conclude the Claim is credible and merits judicial review for appropriate relief." Thus, the Commission found that there was sufficient evidence

---

[6] In *People v. Whirl*, 2015 IL App (1st) 111483, this court considered a petition that combined a postconviction petition with a petition for relief under the Act. However, we disposed of the issue based on the postconviction petition and did not analyze the Act. See *Whirl*, 2015 IL App (1st) 111483, ¶ 111 ("Because we have determined that Whirl is entitled to a new suppression hearing under the Postconviction Act, we need not address Whirl's claim for the identical relief under the TIRC Act.").

to move forward with the case, as is its duty under the Act. See 775 ILCS 40/45(c) (West 2010) ("If 5 of more of the 8 voting members of the Commission conclude by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the case shall be referred to the Chief Judge of the Circuit Court of Cook County ***.").

¶ 78    While the Act is unusual in that a claim of torture is considered first by the Commission and then by the circuit court, an analogy that is helpful in understanding the framework is drawn by the Commission itself on its website. There, the Commission states that "[i]f a matter is referred to [the circuit] court, a claimant can receive what is referred to in Illinois as a 'third stage post-conviction hearing.' This means that the claimant can have a full court hearing before a judge to show by a preponderance of the evidence that his confession was coerced." State of Illinois Torture and Relief Commission, Mission and Procedure Statement, http://www.illinois.gov/tirc/Pages/default.aspx (last visited Mar. 1, 2016). See also *Whirl*, 2015 IL App (1st) 111483, ¶ 51 (in its motion to dismiss, "[t]he State conceded that the judicial review contemplated under the TIRC Act is akin to a third-stage evidentiary hearing under the Postconviction Act"). Thus, thinking about the process of a torture claim through the lens of the more common postconviction process shows that the initial screening of the claim is roughly comparable to the first stage, the Commission's inquiry and recommendations are the second stage, and the circuit court hearing is the third stage evidentiary hearing. Each stage serves a type of gatekeeping function, screening out claims until the circuit court is presented with those claims that are most likely to be meritorious.

¶ 79    Thus, when the Commission issues a disposition of a torture claim, it is simply finding that there is sufficient evidence to proceed to the next step, namely, a hearing before the

circuit court. The Commission is not asked to make a final determination as to whether a claimant in fact proved that he was tortured, as defendant implies. The question we must determine is whether this finding is entitled to any preclusive effect at the next stage of the proceedings before the circuit court.

¶ 80    "The doctrine of collateral estoppel prevents the relitigation of issues resolved in earlier causes of action." *State Building Venture v. O'Donnell*, 239 Ill. 2d 151, 158 (2010). Its applicability is a question of law that we review *de novo*. *State Building Venture*, 239 Ill. 2d at 158. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 81    "Collateral estoppel is an equitable doctrine and its application is governed by certain general principles." *Gumma v. White*, 216 Ill. 2d 23, 38 (2005). Our supreme court has explained that "the minimum threshold requirements for the application of collateral estoppel are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Gumma*, 216 Ill. 2d at 38.

¶ 82    Here, defendant argues that the "prior adjudication" in question was the Commission's disposition of his torture claim. "The doctrine of collateral estoppel applies to prior decisions by administrative agencies that are adjudicatory, judicial, or quasi-judicial." *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 42; *Lelis v. Board of Trustees of the Cicero Police Pension Fund*, 2013 IL App (1st) 121985, ¶ 30. "The party claiming collateral estoppel has the burden of establishing it by clear, concise, and unequivocal evidence."

*Pedersen*, 2014 IL App (1st) 123402, ¶ 42. In the case at bar, we cannot find that defendant satisfied this burden and find that collateral estoppel does not apply for several reasons.

¶ 83                                1. Not a Judicial Decision

¶ 84        First, the Commission's decision is not the type of adjudicatory, judicial, or quasi-judicial decision to which collateral estoppel applies. For instance, in *Osborne v. Kelly*, 207 Ill. App. 3d 488, 491 (1991), the court found that the proceedings underlying the decision of the Board of Review were judicial in nature after examining the procedures for adjudicating disputed unemployment claims and concluding that "[t]he administrative determination of plaintiff's claim was reached after a sufficiently extensive and adversarial hearing, conducted under oath and on the record." See also *John O. Schofield, Inc. v. Nikkel*, 314 Ill. App. 3d 771, 783 (2000) (finding that the decision of the Department of Mines and Minerals as to the plaintiff's ownership interest was made in a proceeding that was adjudicatory, judicial, or quasi-judicial in nature, after examining the Department's statutory authority and the procedures utilized at the hearing). By contrast, the court in *Edmonds v. Illinois Workers' Compensation Comm'n*, 2012 IL App (5th) 110118WC, ¶ 27, found that the decision of a district director with respect to claims under the federal Black Lung Benefits Act (30 U.S.C. § 901 *et seq.* (2000)) was investigative or administrative in nature rather than adjudicatory, due to "[t]he informal nature at the initial stage of the federal proceeding, coupled with the constraints placed on the nature of evidence that a claimant can initially submit in support of a claim for federal benefits."

¶ 85        In the case at bar, the Act describes an investigative function for the Commission, not an adjudicatory or judicial one. The Act provides that the Commission's duties include "conduct[ing] inquiries into claims of torture" (775 ILCS 40/35(2) (West 2010)), and

"prepar[ing] written reports outlining Commission investigations and recommendations to the trial court at the completion of each inquiry" (775 ILCS 40/35(5) (West 2010)). Once the claim form has been submitted, as well as the claimant's waiver of rights, the Commission's director conducts an informal inquiry into the claim, "consisting of taking all reasonable steps to interview the convicted person, interview any witnesses identified by the convicted person, and review any documents provided by the convicted person." 2 Ill. Adm. Code 3500.360, adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). At the completion of the informal inquiry, the director may recommend that the Commission forego a formal inquiry and instead refer the case directly to the circuit court for appropriate relief. 2 Ill. Adm. Code 3500.370(a), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011).

¶ 86    If the matter proceeds to a formal inquiry, the director, acting on behalf of the Commission, may use any measure contained in the Code of Civil Procedure (735 ILCS 5/101 *et seq.* (West 2010)) and the Code of Criminal Procedure of 1963 (725 ILCS 5/101-1 *et seq.* (West 2010)) "to obtain information necessary to the inquiry," including issuing and serving subpoenas or other process to compel the attendance of witnesses and the production of evidence; administering oaths; issuing written interrogatories; conducting oral depositions; conducting physical and/or psychological examinations of the convicted person to ascertain evidence of torture; hiring experts or other specialists as needed to assist the Commission in its inquiry; and conducting on-site visits to detention centers or other locations where torture is alleged to have taken place. 2 Ill. Adm. Code 3500.375(a), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). The director then reports the results and his or her recommendation to the full Commission in a written report that "summarize[s] all the relevant evidence, includ[ing] the reasons for the recommendation, and present[s] any other matters necessary

32

for the Commission to make an informed decision regarding the claim." 2 Ill. Adm. Code 3500.375(i), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). The Commission may vote to decide the disposition of the case at that point or may choose to conduct an "evidentiary proceeding" to receive additional evidence. 2 Ill. Adm. Code 3500.375(i), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011).

¶ 87    If the Commission chooses to conduct an evidentiary hearing, "all relevant evidence from the formal inquiry shall be presented to the full Commission in summary form as part of the Director's report and recommendation." 2 Ill. Adm. Code 3500.380(a)(1), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). Additionally, "[t]he Director shall present the additional evidence the Commission has elected to consider, unless the Commission orders otherwise." 2 Ill. Adm. Code 3500.380(a)(2), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). All testimony is to be taken under oath or affirmation, and all proceedings are to be recorded by audio and transcribed as part of the record. 2 Ill. Adm. Code 3500.380(a)(3), 3500.380(c), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011). After hearing the evidence, the Commission votes to establish further case disposition, either referring the case to the circuit court or concluding there is insufficient evidence to merit judicial review. 775 ILCS 40/45(c) (West 2010).

¶ 88    Examining the procedures set forth by the Act and its regulations, we cannot find that the Act sets forth a judicial proceeding for purposes of collateral estoppel. The Act does not describe an adversarial proceeding but describes an investigation conducted by the Commission after the claimant has filed a claim of torture. While the Act provides that the claimant is entitled to an attorney prior to signing a waiver of his or her procedural rights and "throughout the formal inquiry" if such a formal inquiry is granted, the Act does not provide

either the claimant or the State any other rights. A hearing on the claimant's torture claim is purely discretionary, and the Commission may refer a claim to the circuit court without such a hearing. See 2 Ill. Adm. Code 3500.370(a), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011) (referring a claim directly to the circuit court after an informal inquiry by the director); 2 Ill. Adm. Code 3500.375(i), adopted at 35 Ill. Reg. 15125 (eff. Aug. 25, 2011) (referring a claim to the circuit court based on the director's recommendation after conducting a formal inquiry). Furthermore, if a hearing is conducted, it is the director who presents evidence, not any party. Indeed, the State is not even entitled to notice of the Commission's proceedings until after the Commission has issued a decision. See 775 ILCS 40/45(c) (West 2010) (providing for service on the State's Attorney of the Commission's opinion with supporting findings of fact). Thus, defendant's claims in his brief that the Commission "hears opening and closing arguments from counsel" and "both the Defendant and the prosecution had an adequate opportunity to present witnesses and evidence" are without support in the language of the Act or its regulations. In fact, in the case at bar, the Commission heard no additional evidence prior to issuing its decision, much less argument from the parties. We cannot find that this is the kind of adjudicatory or judicial decision to which collateral estoppel applies.

¶ 89       In support of his argument that the Commission's decision was a judicial one, defendant relies primarily on *Crot v. Byrne*, 646 F. Supp. 1245 (N.D. Ill. 1986), a federal district court case interpreting whether the Illinois Industrial Commission acted in a judicial capacity when denying the plaintiff's workers' compensation claim. We first note that, as a decision by a federal court interpreting Illinois law, *Crot* is at most persuasive authority and is not binding on this court.[7] *In re Estate of Opalinska*, 2015 IL App (1st) 143407, ¶ 26. More importantly,

---

[7] Curiously, on this issue, defendant's brief relies almost entirely on federal law, with only one citation to an Illinois case.

however, the procedures described in that case differ greatly from the procedures described in the Act at issue in the instant case.

¶ 90    The district court there noted that it was required to determine whether the agency's procedures entailed the essential elements of an adjudication, including "adequate notice, the right of parties to present evidence on their own behalf and rebut evidence presented by the opposition, a formulation of issues of law and fact, a final decision, and the procedural elements necessary to conclusively determine the issue in question." *Crot*, 646 F. Supp. at 1255. Considering these factors, the court found that "[t]he rules and procedures utilized by the Illinois Industrial Commission to resolve workers' compensation claims clearly entail the essential elements of an adjudication," pointing to rules providing that (1) all parties receive notice of the hearing and an opportunity to present evidence on their own behalf and rebut evidence presented by the opposition; (2) only attorneys licensed to practice in Illinois may appear on behalf of parties; (3) parties may issue subpoenas to compel the attendance of witnesses and the production of documents at the hearings; (3) the Illinois Rules of Evidence apply in all proceedings; (4) evidence depositions may be taken pursuant to stipulation of the parties or order of the arbitrator; (6) attorneys are entitled to make opening and closing statements; and (7) arbitrator decisions are required to clearly state the legal and factual issues presented for resolution by the parties and state findings of fact and conclusions of law with regard to each issue presented. *Crot*, 646 F. Supp. at 1255-56. The court concluded that "[g]iven the procedural and evidentiary safeguards afforded claimants before the Industrial Commission, this Court has no doubt that the procedure utilized allows claimants a full and fair hearing." *Crot*, 646 F. Supp. at 1256.

¶ 91        By contrast, in the case at bar, the Act provides no such procedural and evidentiary safeguards, and does not entail the essential elements of an adjudication. As explained above, the parties are not entitled to present evidence on their own behalf or rebut evidence presented by the opposition; the State is not even afforded notice of any Commission proceedings until they have concluded. Furthermore, there is no indication that any evidentiary rules apply, with the Commission able to consider "all relevant evidence." 775 ILCS 40/45(a) (West 2010). The only evidentiary safeguard in place is the provision that "[a]ll State discovery and disclosure statutes in effect at the time of formal inquiry shall be enforceable as if the convicted person were currently being tried for the charge for which the convicted person is claiming torture." 775 ILCS 40/40(f) (West 2010). Accordingly, the analysis in *Crot* is not applicable to the statute in the instant case, as the provisions of the two statutes are significantly different.

¶ 92        We are also not persuaded by defendant's attempt to minimize the State's argument by claiming that the State "waived its right to contest the procedures of the commission when it failed to petition for an administrative review of the commission's findings." Defendant fails to recognize that the State is not challenging the procedures of the Commission or the propriety of its findings; those challenges would properly be brought in an administrative review action, as defendant notes.[8] Instead, the State is simply highlighting the

---

[8] We note that the State pointed out at oral argument that it is not entirely clear whether the State has the right to appeal the Commission's decision under section 55 of the Act (775 ILCS 40/55 (West 2010)) since, as we explain below, the State was not a party to the Commission's proceedings. " '[T]he interests that will justify an appeal by one not a party must be direct, immediate and substantial. It must be an interest which would be prejudiced by the judgment or benefit from its reversal.' " *People v. Pine*, 129 Ill. 2d 88, 95 (1989) (quoting *In re Estate of Tomlinson*, 65 Ill. 2d 382, 387 (1976)) (Secretary of State had standing to appeal trial court's order directing it to issue judicial driving permits). See also *In re O.H.*, 329 Ill. App. 3d 254, 257-58 (2002) (Department of Children and Family Services had standing to appeal trial court's probation orders in delinquency cases); *People v. White*, 165 Ill. App. 3d 249, 253 (1988) (Department of Mental Health and Developmental Disabilities had standing to appeal trial court's order requiring it to monitor compliance with conditions imposed on an individual found not guilty by reason of insanity who is conditionally released). But see *Braglia v. McHenry County State's*

Commission's procedures in an attempt to argue that the procedures do not result in an adjudicatory or judicial proceeding. After our independent review of the procedures, we agree with the State. Accordingly, collateral estoppel would not apply to the Commission's findings and the circuit court properly considered whether defendant was able to prove that he had been tortured by the police.

¶ 93                                   2. Elements of Collateral Estoppel

¶ 94        Furthermore, even if the Commission's decision was the type of judicial or adjudicatory decision to which collateral estoppel could apply, defendant fails to demonstrate that the required elements of collateral estoppel are satisfied. As noted, our supreme court has explained that "the minimum threshold requirements for the application of collateral estoppel are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Gumma*, 216 Ill. 2d at 38. In the case at bar, none of these requirements is satisfied.

¶ 95        First, the issue decided by the Commission was not identical to the one presented to the circuit court, nor did it represent a final judgment on the merits. As noted, after either an informal or a formal inquiry, the Commission votes to determine, by a preponderance of the evidence, whether "there is sufficient evidence of torture to merit judicial review." 775 ILCS 40/45(c) (West 2010). If so, the case is referred to the circuit court. 775 ILCS 40/45(c) (West 2010). The case is then assigned to a circuit court judge "for consideration" of the torture

---

*Attorney's Office*, 371 Ill. App. 3d 790, 795 (2007) (Department of State Police did not have standing to appeal trial court's order directing it to issue a firearm owner's identification card to the plaintiff). We have no need to decide whether the State would have had a right to appeal the Commission's decision in the instant case, however, since the State did not seek such an appeal and the resolution of the question does not impact our analysis.

claim. 775 ILCS 40/50(a) (West 2010). The circuit court may receive additional evidence and, if it "finds in favor of the petitioner, it shall enter an appropriate order." 775 ILCS 40/50(a) (West 2010). Thus, while the Commission is asked to determine whether there is enough evidence of torture to merit judicial review, the circuit court is asked to determine whether defendant has been tortured. These are two different issues determined by two different entities.

¶ 96    Defendant claims that "[t]here is nothing in the [Act], or in the legislative history of the act, which indicates that the Illinois General Assembly wanted the claimants to have to go through yet another round of proving their claims, when these claims had already been investigated, evaluated, analyzed, and ruled upon by the commission appointed by the governor and with the advice and consent of the Illinois State Senate." However, we agree with the State that the Commission's decision did not relieve defendant of the burden of proving before the circuit court that he had been tortured.

¶ 97    Defendant's argument would render section 50 of the Act, which provides for postcommission judicial review, to be superfluous. "Statutes should be read as a whole with all relevant parts considered, and they should be construed, if possible, so that no term is rendered superfluous or meaningless." *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001) (citing *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990), and *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16-17, 26 (1996)). Section 50 specifically provides that, once the case is assigned to the circuit court, "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing." 775 ILCS 40/50(a) (West 2010). If, as defendant argues, the issues before the Commission and the circuit court are identical and the circuit court is barred

from deciding the question, there would be no need for a hearing in which the court could receive additional evidence. Defendant's interpretation of the Act flies in the face of the express language of the statute and we will not interpret the Act in that way.

¶ 98    The process of considering the torture claim set forth under the Act also demonstrates why the Commission's decision referring the case to the circuit court was not a final judgment on the merits for the purposes of collateral estoppel. "A final judgment is a determination of the issues presented which ascertains and fixes absolutely and finally the rights of the parties." *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 23 (citing *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 47). In the case at bar, the Commission's disposition did not finally ascertain or fix the rights of any of the parties. The Commission's disposition simply sent the case onto its next step in the circuit court. While the Act is somewhat unusual in that the proceedings before the Commission were concluded but the case itself was not, reaching back to the analogy to a postconviction petition is helpful. What the Commission did was analogous to finding that a postconviction petition could advance to the third stage. No one argues that the second-stage finding is a final judgment on the merits that precludes the consideration of the merits of the issue at the third stage. Likewise, here, the Commission's finding that the case should proceed to the circuit court does not bar the circuit court from conducting its evidentiary hearing.

¶ 99    Additionally, the State, the party against whom the estoppel is asserted, was not a party to the Commission's proceeding. As noted, the first time that the Act mentions notice to the State is when the Commission has issued its disposition. 775 ILCS 40/45(c) (West 2010). The Act also provides that the State is represented at the hearing before the circuit court, but contains no such provision for any hearing before the Commission. 775 ILCS 40/50(b) (West

2010). Thus, the State was not a party during any of the Commission's proceedings and collateral estoppel cannot apply. We again note that defendant's claims that "both the Defendant and the prosecution had an adequate opportunity to present witnesses and evidence" are not supported by the language of the Act or its regulations, which do not afford any of these rights.

¶ 100     Defendant argues that since the Commission is a creation of the State, "[i]f it is a state agency that is conducting the investigation and making the findings, then it is impossible to say that the state was not part of the proceeding." This argument fundamentally misunderstands the nature of the Commission. The Commission is an independent commission, categorized under the Illinois Human Rights Commission for administrative purposes. 775 ILCS 40/15(a) (West 2010). The Commission is not a part of the State's Attorney's office and does not act on behalf of either party when it conducts its investigation. If we accepted defendant's argument, we would be saying that the State is a party to every decision issued by an administrative agency in this State, regardless of whether the State had any interest in the matter at hand or was even notified about the issue. That is a broad proposition we are not willing to accept, nor has defendant provided any legal authority for this sweeping generalization. Instead, courts have consistently found that the mere fact that two entities are both State agencies does not mean that they are in privity for purposes of *res judicata* or collateral estoppel, and at least one court has rejected an argument similar to defendant's. See *Hayes v. State Teacher Certification Board*, 359 Ill. App. 3d 1153, 1164 (2005) (rejecting the plaintiff's argument that the Illinois State Board of Education (ISBE), who issued the decision being appealed, and the State Superintendent were in privity, finding that the School Code required the ISBE to perform certain neutral and ministerial functions

with regard to employment-dismissal proceedings and that the ISBE was not an adversarial or interested party in its cases); *People v. Jones*, 301 Ill. App. 3d 608, 611 (1998) (finding the State was not estopped from pursuing a criminal prosecution where it was not a party to the Department of Corrections' disciplinary proceeding and it was not afforded a full and fair opportunity to litigate the issue). See also, *e.g.*, *Pedersen*, 2014 IL App (1st) 123402, ¶ 46 ("The fact that both a municipality and a pension board are public entities is not enough to establish they are the same parties or are in privity for the purpose of collateral estoppel."); *Hannigan v. Hoffmeister*, 240 Ill. App. 3d 1065, 1076 (1992) ("We are not prepared to accept the plaintiff's argument that the parties are the same because [the University of Illinois and the State Universities' Retirement System] were both State agencies."). But see *Gumma v. White*, 345 Ill. App. 3d 610, 618 (2003) (finding the State was a party at both proceedings for collateral estoppel purposes where the State participated in both proceedings, once through the State's Attorney's office and once through the Secretary of State's office). Thus, none of the three requirements for collateral estoppel are satisfied.

¶ 101     As a final matter, in addition to all of the reasons set forth above, collateral estoppel would not apply in the instant case because "the doctrine extends only to the facts and conditions that existed when the original judgment was entered." *Gallaher*, 2013 IL App (1st) 122969, ¶ 26 (citing *Consiglio v. Department of Financial & Professional Regulation*, 2013 IL App (1st) 121142, ¶ 44). In the case at bar, after the Commission issued its disposition, the case was referred to the circuit court, which conducted an evidentiary hearing. At the hearing, the circuit court heard the testimony of two witnesses, including defendant, who had not testified before the Commission and who had never testified during the proceedings leading up to his conviction. Thus, the Commission's decision could not act

41

as collateral estoppel with respect to evidence that was not before it. See *Gallaher*, 2013 IL App (1st) 122969, ¶ 26 (where a statute had been amended since the first case, "[t]he 2010 order could not act as collateral estoppel with respect to a statute it did not construe").

¶ 102    For all of the reasons set forth above, we find that collateral estoppel did not apply to the Commission's disposition of defendant's torture claim.

¶ 103                    3. Law of the Case

¶ 104    For similar reasons, we find defendant's arguments concerning law of the case to be equally unpersuasive. Defendant argues that "[a]s law of the case, the [Commission's] finding that Defendant was tortured controls all of [defendant's] post-conviction relief." "[T]he law of the case doctrine bars relitigation of an issue previously decided in the same case." *Krautsack v. Anderson*, 223 Ill. 2d 541, 552 (2006). However, in the case at bar, as we have explained above, the issue before the Commission was not the same issue that was before the circuit court. The Commission was required to determine whether sufficient evidence existed for the torture claim to proceed to the circuit court for a hearing. By contrast, the circuit court was required to consider whether defendant had proven that he was tortured by the police officers. Since these are not the same issues, there can be no "relitigation of an issue previously decided in the same case." *Krautsack*, 223 Ill. 2d at 552. Consequently, the law of the case doctrine is not applicable.

¶ 105              II. Propriety of Circuit Court's Findings

¶ 106    As his second basis for appeal, defendant argues that the circuit court's order denying him relief under the Act was against the manifest weight of the evidence. The parties agree that we should review the circuit court's decision under the manifestly erroneous standard, which "represents the typical appellate standard of review for findings of fact made by a trial

42

judge." *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998). This deference reflects "the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *Coleman*, 183 Ill. 2d at 384 (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)). A circuit court's decision is manifestly erroneous if it contains an error that is " ' "clearly evident, plain, and indisputable." ' " *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (quoting *People v. Johnson*, 206 Ill. 2d 348, 360 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 107    In the case at bar, after an evidentiary hearing, the circuit court entered an order finding that "there is absolutely no credible evidence that Darryl Christian is entitled to any relief whatsoever on his claim of torture." The court further found:

> "Darryl Christian gave four different versions of his actions with regard to the murder of Lottie Anderson prior to being charged. He testified under oath he never made the statement he signed. No credible evidence exists that Mr. Christian was ever slapped before he gave his final version of the events leading up to the murder. It should be noted that final statement made by Mr. Christian minimizes his actions.
>
> Any relief would be a miscarriage of justice. Based on the evidence heard and received, relief is denied."

We cannot find that the circuit court's findings were against the manifest weight of the evidence.

¶ 108    First, defendant argues that the circuit court's finding that defendant "gave four different versions of his actions" concerning the murder was "absolutely without any basis in the

record whatsoever." However, as the State points out, (1) Officer Hunter testified at defendant's trial that defendant told him that he had left for work at 10 p.m. on June 23 and did not return until 10 a.m. the next morning; (2) Detective Cummings testified at defendant's trial that defendant told him at the scene that he had been with friends from 10 p.m. until 8 a.m.; (3) Detective Cummings testified at defendant's trial that after questioning at Area 2, defendant admitted that he had an argument with his mother that resulted in his stabbing her more than once; and (4) ASA Fischer testified at defendant's trial that defendant told him that defendant and his mother had argued and that, while trying to take the knife his mother held away, his mother received one stab wound. Thus, there is a basis in the record for the circuit court's finding and we cannot find that it was against the manifest weight of the evidence.

¶ 109 Defendant next challenges the circuit court's finding that defendant "testified under oath he never made the statement he signed." While defendant admits that "this is technically true," he argues that "[t]here is much more to it." Defendant argues that he testified before the circuit court that he admitted that he killed the victim after being abused, but that all of the facts included in the statement were fabricated by others, which he says is consistent with the testimony from his discovery deposition concerning the torture claim, which was admitted into evidence by the circuit court at his hearing. However, as the State points out, it is not only these two places where defendant made representations under oath about the statement. For instance, defendant attached an affidavit to his *habeas corpus* petition in which he stated that he did not make an incriminating statement when he spoke with Detective Cummings. Thus, there is a basis in the record for the circuit court's finding and we cannot find that it was against the manifest weight of the evidence.

¶ 110    Next, defendant argues that the circuit court erroneously found that "[i]t should be noted that [the] final statement made by Mr. Christian minimizes his actions." Defendant argues that the only thing arguably "minimizing" in the statement is the statement that defendant was sorry. However, defendant overlooks the fact that his statement makes the victim into the aggressor, indicating that she was the one who retrieved a knife from the kitchen. "It is unlikely that a person whose will was overborne would be unable to resist confessing, yet at the same time attempt to mitigate the effect of a confession." *People v. Kincaid*, 87 Ill. 2d 107, 120 (1981). Thus, we cannot find that the circuit court's finding was erroneous or against the manifest weight of the evidence.

¶ 111    Finally, defendant challenges the circuit court's finding that "no credible evidence exists that Mr. Christian was ever slapped before he gave his final version of the events leading up to the murder" and its ultimate conclusion that "there is absolutely no credible evidence that Darryl Christian is entitled to any relief whatsoever on his claim of torture." Defendant argues that he has continually maintained that he was abused by the police since 1990 and that his testimony at the evidentiary hearing was unrebutted. Defendant also argues that his testimony that the written statement was fabricated was corroborated by inconsistencies between the statement and the actual facts, pointing to examples such as the number of stab wounds. While defendant is correct that Detective Cummings was not called to testify before the circuit court, a transcript of his testimony from defendant's suppression hearing was admitted into evidence. In that transcript, Detective Cummings testified that he did not strike defendant. Thus, defendant's testimony was not unrebutted. Furthermore, "the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony,

45

and the reasonable inferences to be drawn from the evidence." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We cannot find that the circuit court's determination that defendant was not credible was against the manifest weight of the evidence.

¶ 112                                                    CONCLUSION

¶ 113        For the reasons set forth above, we affirm the circuit court's dismissal of defendant's claim for relief under the Act. Collateral estoppel did not apply to the Commission's finding and the circuit court's conclusion that defendant was not entitled to any relief was not against the manifest weight of the evidence.

¶ 114        Affirmed.