# Illinois Official Reports

## Appellate Court

*People v. Gibson*, 2018 IL App (1st) 162177

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES GIBSON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-2177 |
| Filed<br>Rehearing denied | March 22, 2018<br>April 24, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 90-CR-3212; the Hon. Neera Walsh, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Joel A. Brodsky, of Law Offices of Joel A. Brodsky, and Ramon A. Moore, of Law Offices of Ramon A. Moore, both of Chicago, for appellant.<br><br>Robert A. Milan, Special State's Attorney, of Chicago (Myles P. O'Rourke and Brian J. Stefanich, Assistant Special State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant James Gibson was convicted after a bench trial, and sentenced to life in prison, for the 1989 murders of Lloyd Benjamin and Hunter Wash. By the trial judge's own admission, the key piece of evidence in the State's case was an incriminating admission defendant made to Area 3 detectives under the command of Jon Burge, in which defendant placed himself at the scene of the murders. Though defendant would later claim that he was coerced into giving a false statement after two days of physical abuse at the hands of the police, defendant made no serious attempt to suppress that statement pretrial because his lawyer stated on the record that he deemed the statement "exculpatory"—favorable, not hurtful, to defendant's case—merely because defendant had not outright confessed to the murder in the statement, admitting only to being present at the scene. Counsel's interpretation would prove quite ironic later, given that the trial court found that statement to be anything but exculpatory—finding it, in fact, to be the lynchpin of the prosecution's case, "of extreme importance" to its finding of guilt.

¶ 2    In 2013, defendant filed a claim before the Torture Inquiry and Relief Commission (TIRC), alleging that his statement was the product of physical abuse by Area 3 detectives. He alleged, in particular, that several officers repeatedly punched and kicked him in the chest, and burned his arm with a heated clothing iron. TIRC found credible evidence that defendant was struck in the chest as he claimed—although it doubted his allegation that he was burned—and referred his claim to the circuit court for an evidentiary hearing. The circuit court, at the post-TIRC hearing, denied his claim after finding that defendant's testimony was not credible.

¶ 3    Defendant raises a multitude of issues on appeal. We reverse and remand for further proceedings based on one of them. At the hearing, two of the accused officers, former Sergeant John Byrne and former Detective John Paladino, invoked their fifth-amendment rights against self-incrimination. Believing that defendant's allegations were rebutted by several other detectives who testified, the circuit court declined to draw an adverse inference against Byrne or Paladino.

¶ 4    While an adverse inference is permissive rather than mandatory, we think it can be error not to draw one when there is no credible reason for refusing to do so. And here, certain of defendant's allegations against Paladino were not rebutted by any of the detectives' testimony or by any other evidence in the record. Those allegations were also corroborated—not proven, but corroborated—by defendant's immediate complaint to the Chicago Police Department's Office of Professional Standards and by contemporaneous documentation of his injuries, which, a forensic pathologist testified, were consistent with his allegations that Paladino and other officers repeatedly punched and kicked him in the chest.

¶ 5    A law enforcement officer's refusal to answer these allegations under oath is not to be taken lightly. The circuit court needed some defensible reason to refuse to draw an adverse inference. It did not have one. And that error, for reasons we will explain, could have changed the outcome of the hearing.

¶ 6    In light of that conclusion, we do not reach the other issues defendant has raised. But in the course of addressing the issue we find dispositive, we do address a question of law presented by several disputed evidentiary rulings, since that question will necessarily recur at any evidentiary hearing on a claim referred by TIRC. The question is: Do the Illinois Rules of Evidence apply at these hearings? We hold that they are "postconviction hearings," within the meaning of Rule 1101, and that the rules of evidence therefore do not apply. See Ill. R. Evid.

1101(b)(3) (amended Apr. 8, 2013).

## I. BACKGROUND

The victims, Benjamin and Wash, were shot and killed on December 22, 1989, while leaving a garage on the southwest side of Chicago. Benjamin, an insurance agent, was on his route collecting weekly premium payments. Benjamin's cash and other personal effects were found with his body, but the police suspected attempted robbery as the shooter's motive. Wash, a neighborhood mechanic who owned the garage, was a client of Benjamin's.

### A. Investigation

On December 27, 1989, acting on an anonymous tip, detectives from the Area 3 Violent Crimes Unit detained defendant. The commanding officer of the unit at that time was Jon Burge. Over the next three days, several of Burge's subordinates interrogated defendant. According to the police reports (which the circuit court admitted into evidence at the post-TIRC hearing), those detectives included Anthony Maslanka, John Paladino, William Moser, Louis Caesar, John O'Mara, Phillip Collins, and John McCann. The supervising detective on the case was Sergeant John Byrne.

Defendant did not confess to the murders. But on December 30, 1989, after three days in police custody, he did admit that he was at Wash's garage when the murders were committed. He told the detectives that Eric Johnson (aka Keith Smith) handed a gun to a neighborhood drug addict named Fernando Webb, who shot Benjamin and Wash as they exited the garage.

The detectives confronted Johnson and Webb, who were also being questioned at Area 3, with defendant's statement. Johnson admitted that he was present at the crime scene, but he said that defendant shot Benjamin and Wash, while Webb acted as defendant's lookout. Webb, who had initially denied any knowledge of the murders, said that he passed by the garage, on his way home from getting his heroin fix, and saw an unidentified black male standing near the door.

Assistant State's Attorney (ASA) Lynda Peters interviewed the three suspects and concluded that further corroboration was required before any charges could be filed. Defendant was released from Area 3 and returned home on the evening of December 30, 1989.

The next day, on December 31, 1989, Johnson confessed to acting as a lookout while, he now claimed, defendant shot the victims. Webb, for the first time, also named defendant as the shooter. Johnson's sisters implicated defendant in an alleged plan to rob Benjamin. Defendant was arrested, without a warrant, later that day. He did not make any further statements after his arrest. Defendant and Johnson were both charged with the murders.

### B. Defendant's Trial

Defendant's trial counsel filed a boilerplate motion to suppress, alleging that defendant was arrested without probable cause. Defendant filed a *pro se* supplemental motion to suppress. When the judge at defendant's trial asked defense counsel to clarify what specific evidence fell within the purview of the pretrial motions, counsel acknowledged that defendant "might" have made a statement to the police, but it was an "exculpatory-type statement[ ]" and "not [an] inculpatory statement[ ]," so it was not subject to suppression. The State likewise

argued that neither counsel's motion nor defendant's *pro se* motion sought to suppress his statement placing himself at Wash's garage, and counsel did not contest the State's position.

¶ 17    Johnson, meanwhile, moved to suppress his confession on the ground that it was coerced through physical abuse. At his suppression hearing, Johnson testified that after his December 29, 1989, arrest, detectives hit him in the face, chest, ribs, arms, and stomach; kicked him; used racial slurs; and failed to Mirandize him. He ultimately signed a written statement that he did not write or review because he "was tired of getting beat," and the detectives told him he could go home if he signed the statement. Because Johnson could not identify by name the detectives who abused him, the State called Detectives Moser, Paladino, Maslanka, Collins, McCann, Caesar, Jerome Rusnak, and Victor Breska; polygraph examiner Robert Tovar; and ASAs Peters and Richard Correa—all of whom, in sum, denied having any knowledge of the alleged abuse. Based on those denials, and Johnson's failure to corroborate his claims with medical records or photographs, the trial judge denied his motion.

¶ 18    Defendant and Johnson were tried separately. At defendant's bench trial, the State's case rested on the testimony of Johnson's sisters, Carla Smith and Janice Johnson; Webb; and Detective Moser, who testified to defendant's incriminating admission. The murder weapon was never recovered, and there was no physical evidence linking defendant to the shootings. Because Johnson did not testify, his statement implicating defendant as the shooter was not introduced. Defendant did not take the stand.

¶ 19    One of Johnson's sisters, Carla, testified that on December 20, 1989, she was at home with Johnson and defendant. Defendant said that he was "starving," that his "car needed fixing," and that he "would have to stick up the insurance man" to get money. Defendant added that "if [Benjamin] panicked" during the stick-up, he "would have to shoot him." And on December 21, 1989, Carla heard defendant ask her brothers for some .32-caliber bullets—the same caliber as the bullets recovered from the victims. On cross-examination, Carla testified that the police told her they would release Johnson if she made a statement and that she did not read the written statement that she signed.

¶ 20    Johnson's other sister, Janice, testified that on December 20, 1989, she overheard defendant tell her brothers that "he was going to do a stick up" of the "insurance man." Like Carla, Janice testified on cross-examination that the police told her they would release Johnson if she made a statement. She further testified that after defendant was arrested, she ran into Webb on the street, twice, and both times he told her that he had lied to the police about this case.

¶ 21    At the time of defendant's trial, Webb was in jail on a pending armed-robbery charge. He testified that pursuant to a plea deal he reached with the State, he would be released that evening, after testifying against defendant. Webb, an admitted drug addict, further testified that on the day of the murders, he walked by Wash's garage, on his way to buy heroin, when he saw defendant standing outside the garage with a gun in his hand. Webb saw another person, whom he could not identify, standing by the back of the garage. Webb acknowledged defendant and continued on his way. On cross-examination, Webb admitted that he had lied to the police at first and that he implicated defendant only after realizing he was under suspicion and could soon face charges himself.

¶ 22    The State called Detective Moser to introduce defendant's inculpatory statement. Counsel objected that defendant's statement was hearsay and did not fall within the exception for statements against penal interest because it was exculpatory. Noting that "[w]e did not have

any pretrial motion on it," the trial court agreed to hear Detective Moser's testimony before ruling on whether defendant's statement was admissible.

Moser testified that defendant told him, along with Detectives Caesar and McCann, that he was outside Wash's garage at the time of the murders. Defendant said that Johnson gave Webb a gun, and Webb then shot both of the victims. Defendant also said that he previously had overheard Johnson and Webb planning a robbery.

After Detective Moser testified, counsel argued again that defendant's statement was not admissible as a statement against his penal interests because defendant merely admitted that he was *present*, not that he was *involved*. The trial court admitted defendant's statement, both because it *was* inculpatory, and therefore against his penal interests, and because it was an admission of a party-opponent, and therefore not hearsay in the first place.

In finding defendant guilty, the trial judge took Webb's testimony "with more than just a grain of salt," finding that it "would not be sufficient on its own to convict anyone, including [defendant]." The judge acknowledged that Johnson's sisters "had an interest in protecting" him, but found that they still testified credibly. Above all, the judge explained, "the statement from [defendant]"—the same statement defendant's lawyer thought was exculpatory—was "of extreme importance to my findings" of guilt since it corroborated the testimony of the other witnesses.

We affirmed defendant's convictions on direct appeal. *People v. Gibson*, No. 1-92-2306 (1993) (unpublished order under Illinois Supreme Court Rule 23), *appeal denied*, 158 Ill. 2d 557 (1994). Defendant later filed, in sum, four postconviction petitions, a petition for relief from judgment, and a federal *habeas corpus* petition. Defendant did not allege that the police physically abused him or coerced his statement in any of these collateral pleadings, although he did allege, in some of them, that Johnson's statement was physically coerced.

### C. Postconviction Proceedings

In 2006, codefendant Johnson filed a successive postconviction petition. He alleged that the recently released report of the special state's attorney was newly discovered evidence that supported a claim of actual innocence. Johnson swore in his affidavit that Paladino, Maslanka, Breska, and McCann punched and kicked him in the face and ribs and made racial slurs during his interrogation at Area 3. After the circuit court denied leave to file the petition, we remanded for further proceedings, based on the parties' agreement that Johnson alleged a *prima facie* claim that his confession was coerced by police torture. On remand, the State agreed to Johnson's immediate release, in exchange for his *Alford* plea to one count of first-degree murder. See *North Carolina v Alford*, 400 U.S. 25 (1970). Johnson was released from prison sometime in 2012.

In 2011, defendant filed a petition for executive clemency. The petition alleged that he was the victim of torture "administered by at least two infamous detectives," whom he identified as Paladino and Maslanka. Specifically, defendant alleged that the officers struck him in the chest and burned a tattoo of his nickname, "Peter Gunn," off of his arm with an iron.

### D. TIRC Proceedings

In May 2012, defendant filed a "claim of torture" under the Illinois Torture Inquiry and Relief Commission Act (Act). See 775 ILCS 40/1 *et seq.* (West 2012). The TIRC is an

eight-person commission, appointed by the Governor, to investigate allegations of police torture. The commission consists of a retired circuit court judge, a former prosecutor, a public defender, a law professor, a criminal-defense lawyer, and three nonattorney public members not affiliated with the judicial branch. See 775 ILCS 44/20(a) (West 2014).

¶ 32 On his claim form, defendant alleged that Paladino, Maslanka, McCann, "and several others" hit, kicked, and burned him. The TIRC conducted an investigation, subpoenaing myriad documents, obtaining an opinion from a forensic pathologist, and conducting interviews, including one with defendant.

¶ 33 During his interview via video conference, defendant claimed that he was repeatedly slapped, punched, and kicked. Numerous detectives interrogated him, often "switching up" from one interrogation session to the next, but defendant named Paladino, Maslanka, McCann, and Caesar as his alleged abusers. He also claimed that on one occasion, Paladino and Maslanka burned his arm with a clothing iron.

¶ 34 The TIRC ultimately issued a 17-page report, finding "sufficient corroborating evidence of torture" to warrant judicial review of defendant's claims. The TIRC found "substantial contemporaneous evidence" of defendant's claims, including his immediate complaint of abuse to the Chicago Police Department's Office of Professional Standards (OPS), at his sister's urging, after his initial release from police custody; his recounting of police abuse to his public defender, to an OPS investigator, and to doctors at Cermak Hospital; and photographs, ordered by Judge Bastone, of defendant's bruising at the time of his bond hearing. These contemporaneous reports, the commission found, were very similar to those made by codefendant Johnson and to many of those made by other victims of Jon Burge and his detectives that came out years later.

¶ 35 The TIRC recognized inconsistencies in defendant's testimony, most notably his claim to have been burned by an iron; the commission determined that there was "a significant chance [defendant] fabricated this assertion to minimize his potential guilt and/or to increase the severity of his claimed torture." Finally, the TIRC noted that defendant filed suppression motions before trial but never mentioned police abuse within them—but the commission acknowledged that the failure to raise that issue pretrial may been the result of tactical, if incompetent, legal strategy by defendant's public defender at the time.

¶ 36 The TIRC also determined that the police had a motive to coerce an inculpatory statement against defendant, as the case against defendant, aside from his incriminating statement, was "otherwise weak." The commission noted that defendant was placed at the scene by a heroin addict (Webb) who only implicated defendant after defendant implicated him; that codefendant Johnson's sisters had a motive to implicate defendant and later admitted they only made those statements to secure their brother's release; that no physical evidence supported the conviction; that even the State's internal case evaluation characterized the case as "extremely weak" and "entirely circumstantial"; and that the trial judge had relied overwhelmingly on the inculpatory statement given by defendant, stating that it was "of extreme importance" to the finding of guilt.

¶ 37 The TIRC thus referred defendant's claim to the circuit court, where the evidence in question was presented at a hearing.

¶ 38                                E. Post-TIRC Hearing in Circuit Court

¶ 39        At the hearing before the circuit court, defendant testified that he was detained at his mother's house and transported to Area 3 on December 27, 1989. He was handcuffed to a chair and left alone. The next day, he was placed in several lineups throughout the course of the day. But he was not questioned on either day. His interrogations—and his alleged abuse—began on December 29, 1989.

¶ 40        On December 29—sometime in the morning, defendant thought, although his perception of time was none too clear at that point—defendant had a short conversation with Detectives O'Mara and Collins. They did not abuse him at that time. But sometime later that day—again, defendant could not be sure exactly when—they came back with Paladino, Maslanka, and Detective Thomas Ptak. That is when the alleged physical abuse began.

¶ 41        One of defendant's arms was cuffed to the chair. Paladino slapped him and threatened, "we through playing with your ass n***." Maslanka told defendant that Johnson had implicated him and his brother in the murders; defendant responded that perhaps it was Johnson and *his* brother who committed them. Maslanka then kicked him in the left side of his rib cage and punched him in the right side. Paladino slapped him "upside the head." The detectives warned him, "n*** stop playing," and threatened to "kick his ass all night" unless he started talking. O'Mara and Collins punched him in his rib cage, stomach, and sides; Collins kicked him in the groin. Then all of the detectives, after further warnings that defendant had better start talking, began "flooding" him, that is, barraging him with an onslaught of slaps, punches, and kicks, all while verbally threatening him that he had better make a statement and say what they wanted him to say. At some point, defendant claimed, he blacked out.

¶ 42        The next day, Rusnak and Breska came to ask if he would take a polygraph exam. (Defendant initially testified that it was McCann and Caesar, but he quickly changed his testimony and said it was Rusnak and Breska. Defendant admitted that sometimes he gets the various detectives confused because he encountered so many throughout his detention.) They said if he took the test and cleared everything up, "all this ass whooping" would stop. At some point, defendant agreed, but the detectives did not take him to the polygraph examiner until sometime later.

¶ 43        Meanwhile, Collins and O'Mara returned, alone, and resumed punching him. At some point, a group of other detectives—Maslanka, Paladino, Byrne, Caesar, and McCann—all came into the room. Byrne pulled out a gun and held it; eventually he laid it on the table and asked if it was the gun defendant used in the murders. Two of the detectives left the room and came back with an iron. Maslanka said that the officers heard defendant had a "Peter Gunn" tattoo on his arm; defendant acknowledged that was his nickname. Maslanka then burned defendant's tattoo with the iron. Byrne picked the gun up from the table, and the detectives left the room.

¶ 44        Rusnak and "the other guy" (Breska) returned to take defendant to the polygraph exam. Defendant told them, "mother fucker just burn me, man." They told defendant he was crazy and drove him downtown. During the exam, defendant touched the paper in the polygraph machine because, he said, he wanted to see it. The examiner pulled it away from defendant, and it ripped. Rusnak and Breska "bust into the room" and grabbed him by the neck. Defendant was "hit in the back" with "some type of blow" or "maneuver" that the detectives used. Rusnak and Breska handcuffed defendant and drove him back to Area 3.

¶ 45    There, O'Mara and Collins resumed slapping defendant upside the head and demanding that he start talking. Defendant told them that he saw Johnson give Webb a pistol, and Webb shot "the white guy" (Benjamin). That was not true, but defendant said it to stop the beating.

¶ 46    After defendant made that statement, Caesar, McCann, and Moser came into the room, uncuffed him, and took him to speak with ASA Peters. Defendant testified that McCann and an Officer (in fact, it was Detective) Foley stayed in the room during the interview. They told defendant to tell ASA Peters what he had just said to the officers, and this would all be over. Defendant did so.

¶ 47    After ASA Peters concluded that defendant would not be charged at that time, Paladino and Maslanka drove him home. During the ride, they told him if he could provide them the murder weapon, this would all go away. On cross-examination, defendant testified that he asked them to drive around the block and drop him off somewhere other than his house. Because he was a drug dealer and had "control of the neighborhood," he did not want to be seen stepping out of a police car. Defendant testified that the officers dropped him off somewhere "on the side of [his] house."

¶ 48    When defendant went inside, his sister Lorraine, noticing his appearance, asked what was wrong. Defendant told her what happened at Area 3. That night, at Lorraine's insistence, defendant filed a complaint over the phone with OPS. We describe that complaint in more detail below.

¶ 49    After speaking to OPS, defendant put some ice on his ribs and some cocoa butter on his burn, took some pain pills from his mother's medicine cabinet, and smoked a joint. Although he was in pain, defendant did not seek medical treatment. Living in a rough neighborhood, he was used to "getting [his] ass whipped [his] whole life."

¶ 50    The next day, December 31, 1989, defendant testified that he was planning to obtain medical treatment, but he was busy making arrangements for a New Year's Eve party he was planning to throw for "his guys." He did, at one point, take his pregnant sister to the hospital after she appeared to faint, but he did not seek treatment for himself. After leaving the hospital, defendant went out riding with "his guys." His brother called him on his car phone to let him know that the police were at the house looking for him. Defendant went home, where he was arrested and brought back to Area 3. He did not make any further statements to the police.

¶ 51    In addition to his own testimony, defendant presented documentary evidence that he immediately complained of police abuse. At 9:30 p.m., on December 30, 1989—the evening he was released from Area 3—he filed a complaint, by telephone, with OPS. The complaint stated that "from 27 December 1989 to 30 December 1989, at least two unknown male/white detectives *** physically abused [defendant] by slapping, punching, and kicking him, and made physical threats against him." The complaint, however, also specifically listed Detectives O'Mara and Collins, whose names defendant provided when he was asked about the identity of his alleged abusers.

¶ 52    Defendant's sister, Sergeant Lorraine Brown, testified to the circumstances in which the complaint was filed. Brown was at the family home, on leave from active duty in the U.S. Army, when defendant came back from Area 3. Brown testified that defendant looked like he had been in a fight. His face was slightly swollen, he had a burn mark on his right bicep, and he flinched when she tried to hug him. Samara Burks, defendant's 13-year-old niece, was there too, and she likewise testified that defendant flinched when she tried to hug him, that his face

was swollen and his arm was burned, and that he generally looked "disheveled" and "battered."

¶ 53     Brown asked defendant what happened. He said that the police beat him. Brown insisted on reporting the alleged abuse, but defendant protested, "you don't call the police, they do this all the time." Brown called 911 anyway and was referred to OPS. Defendant reluctantly took the phone and filed a complaint. In his own testimony, defendant explained that he did not know the names of the detectives who had beaten him; they were in plainclothes and did not display their stars. But O'Mara and Collins had left their business cards at the house when they came looking for him a few days earlier. Lacking any better information, defendant gave OPS their names. Later, with the benefit of the information in the police reports, he retrospectively identified his alleged abusers.

¶ 54     OPS found, in due course, that defendant's allegations were uncorroborated and therefore not sustained. Burge, as the commanding officer of the unit, concurred with OPS's findings and signed off on the denial of defendant's complaint.

¶ 55     Second, defendant presented contemporaneous evidence, in the form of photographs and medical records, that documented at least some of the injuries he attributed to police abuse.

¶ 56     Defendant appeared in bond court on January 2, 1990. At his attorney's request, the judge signed an order allowing an investigator from the public defender's office to come to bond court and photograph defendant's injuries. Four color Polaroid photos were taken of defendant's chest and ribcage, bearing handwritten notations that say, "Right Chest Swollen" and "Left Chest Swollen," and the date, January 2, 1990. (At the post-TIRC hearing under review in this appeal, defendant attempted to introduce notes from defendant's public defender at the bond hearing, which stated: "Took pictures of [defendant]—said he was severely beaten by police"—but the circuit court denied the request as hearsay.)

¶ 57     On January 3, 1990, defendant sought treatment at Cermak Hospital. He complained of depression and pain in the left side of his chest. The emergency room record notes that defendant claimed he was "hit by police," but the emergency physician found no apparent trauma to the left chest wall. During defendant's psychiatric evaluation, however, bruises were observed on his left ribs and noted on his patient admission history.

¶ 58     Dr. Michael Kaufman testified as an expert in anatomic and forensic pathology. He had been retained by the TIRC to review the bond court photos, medical records from Cermak Hospital, and defendant's medical history. Dr. Kaufman testified that the photos depicted "swelling" and a "subtle contusion of the underlying subcutaneous tissues" consistent with defendant's allegation of having been "punched in the chest, bilaterally," a few days before the photos were taken. But the photos, he opined, were merely consistent with—not "conclusive proof" of—defendant's allegations. Dr. Kaufman noted the discrepancy in the medical records regarding the presence of bruises on defendant's chest on January 3, 1990, but he could not offer a definitive resolution or explanation of those discrepancies.

¶ 59     Third, as we noted above, Carla testified at trial that she implicated defendant in a plan to rob Benjamin after the police told her that Johnson, her brother, would be released if she made a statement about the case. At the hearing, Carla recanted her incriminating testimony and denied that she never heard defendant discussing a plan to rob Benjamin. Carla testified that the statement she ultimately signed, and later testified to at trial, was false. And it did not reflect what she actually told the police. But she signed the statement anyway because the police told her that they would release her brother if she did.

¶ 60    Fourth, defendant sought to admit evidence, in various forms, of a pattern and practice of police torture by detectives under Burge's command at the Area 2 and Area 3 Violent Crimes Units.

¶ 61    Defendant's counsel first asked the circuit court to take judicial notice of the existence of such a pattern and practice. Counsel argued that it is no longer subject to reasonable dispute that for more than three decades, suspects were routinely and systematically tortured by Burge and his subordinates at Area 2, and later at Area 3, including at the time defendant was interrogated there. In support of this request, the defense cited several Illinois criminal cases and federal civil-rights cases in which there were allegations of abuse by some of the detectives assigned to this case; the City of Chicago's reparations ordinance, which acknowledged the reality of police torture by Burge and his subordinates; as well as the 1996 OPS report (the so-called Goldston Report) and the 2006 report of the special state's attorney (the so-called Egan-Boyle Report), both of which, in sum, found evidence of a systemic practice of physical abuse by detectives under Burge's command. The circuit court ruled that the fact at issue is not amenable to judicial notice.

¶ 62    Apart from judicial notice, the defense sought to introduce the Goldston and Egan-Boyle Reports into evidence. The defense argued that because the Illinois Rules of Evidence do not apply at a third-stage postconviction hearing (Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013)), they should not apply at an evidentiary hearing on a TIRC disposition either because the two are, in practical effect, the same. The circuit court rejected this argument and held that the hearing was bound by the rules of evidence. The court also rejected the defense's argument, in the alternative, that both reports are admissible under the business-records or public-records exceptions to the hearsay rule. Ill. R. Evid. 803(6), (8) (eff. Apr. 26, 2012).

¶ 63    The defense called Michael Goldston to testify to the genesis of his report. Goldston was an investigator who had worked for OPS and its successor organization, the Independent Police Review Authority (IPRA), for 29 years. Goldston testified that the chief administrator of OPS assigned him to make a report of his findings. His "task was to look at the universe of complaints of coercion and torture and find out as much as I could," to "examine whether there was evidence that supported the allegations," and to determine "what the scope of that behavior, those acts were." To compile his report, Goldston reviewed case files, court records, and transcripts of court proceedings and depositions in cases alleging physical abuse by Burge or his subordinates. But he was explicitly ordered by his superiors not to conduct any live interviews of the detectives or their accusers. He also testified on cross-examination that he had no formal training in investigatory techniques and no legal training. Based on his review of paper sources, Goldston testified, he found "sufficient evidence of systematic abuse and torture within a small universe of detectives who worked at Area 2," including Burge, Byrne, Maslanka, and Paladino.

¶ 64    After hearing Goldston's testimony, the circuit court found that even if his report was admissible under the rules of evidence, it would be entitled to little weight, given Goldston's unreliable investigative methods and lack of formal training.

¶ 65    The defense also called codefendant Johnson, who at the time of the hearing went by the name of Keith Smith. Johnson had been released from prison pursuant to his *Alford* plea. On cross-examination, Johnson struggled to answer many of the State's questions about the specific details of his alleged abuse. He testified that his recollections, nearly 27 years later, were not as clear as they once were. But he did testify that he was first interrogated about the

Benjamin and Wash murders by Paladino and Maslanka, who slapped him, punched him, and called him a "n***." Later, Detective McCann punched him and forced him to submit to a polygraph test. Afterwards, Johnson spoke to ASA Peters and told her that the detectives beat him, but Sergeant Byrne soon removed him from the room, put a gun to his face, and told him to "stop fucking playing and tell the officers what they want to hear." Johnson ultimately signed a false statement, implicating himself and defendant, because he wanted the physical abuse to stop.

¶ 66    Lastly, several of the detectives who worked this case, as well as ASA Peters, testified at the evidentiary hearing.

¶ 67    According to documents in the record, Sergeant Byrne was the supervising detective on this case. Byrne invoked his fifth-amendment privilege against self-incrimination and refused to answer any substantive questions about his involvement in defendant's interrogation.

¶ 68    The record also indicates that Detective Paladino was assigned to this case, along with his partner Maslanka. Paladino invoked his fifth-amendment privilege and refused to answer any substantive questions about his involvement in defendant's interrogation.

¶ 69    Other detectives implicated by defendant—Maslanka, O'Mara, Collins, McCann, and Ptak—were deceased by the time of the hearing.

¶ 70    Detective Moser testified, based on his review of the detectives' reports, that he was first assigned to this case on December 30, 1989. At that time, he had a "short conversation" with defendant and one other detective, whom he did not name, at Area 3. "During that conversation," Moser testified, nobody in his presence struck or threatened defendant, but he "ha[d] no idea what happened on the 27th, 28th, 29th." Moser testified that he did not abuse or witness any physical abuse of Johnson, that he never witnessed any physical abuse of a suspect at Area 3 while Burge was the commanding officer, and that he never participated in an interrogation with Burge. To Moser's knowledge, no allegation of physical force had ever been sustained against him, either in a lawsuit or OPS complaint, although he had been named in various lawsuits and complaints of abuse during his time as a detective.

¶ 71    Detective Henry Leja testified, based on his review of the detectives' reports, that he conducted a few field interviews in the area of the murders. But he otherwise had no memory of the investigation at all. He never testified to participating in, witnessing, or even being present at Area 3 during any interrogation of defendant. On cross-examination, Leja answered "no" when the State asked whether he physically abused defendant or witnessed any other detectives do so, but these answers were stricken as beyond the scope of defense counsel's direct examination.

¶ 72    Detective Caesar testified that he was assigned to this case on December 31, 1989, along with his partner, McCann, now deceased. Caesar testified, in sum, that his role in the investigation was limited to investigating Johnson, not defendant. Caesar testified that he was not present for any interview of defendant, and he denied that he ever spoke to defendant or even saw him at Area 3.

¶ 73    Caesar testified that did not physically abuse Johnson or witness any other detectives do so, and while he did not see any signs of abuse on Johnson, he was not specifically looking for any. He did not see Byrne pull out a gun in front of defendant, nor did he see O'Mara or Collins in a room with defendant. Caesar further denied ever physically abusing a suspect, conducting an

interrogation with Burge or Byrne, or having a court judgment or OPS complaint sustained against him based on physical abuse of a suspect.

¶ 74 Detective Rusnak testified, based on his case notes, that he and his partner, Breska, had a short conversation with defendant on the morning of December 29, 1989. They asked defendant if he would agree to take a polygraph exam. Defendant did not agree until sometime later in the day. When he did, they came back to pick up defendant and drove him to the station at 11th and State Streets, where the exam was administered.

¶ 75 While defendant was taking the exam, the detectives, who were outside the room, heard a "disturbance" and rushed in. Defendant was ripping the papers out of the machine and yelling, "It's lying, it's lying on me." Rusnak and Breska restrained defendant's arms and took him back to Area 3. Rusnak denied that either of the detectives hit defendant in the polygraph exam room. Rusnak denied witnessing any physical abuse of defendant, noticing any signs of physical abuse, seeing any detectives with a clothing iron, or smelling burning flesh. He further denied ever conducting an interrogation with Burge. On cross-examination by defense counsel, Rusnak testified that his memory of the case was limited to what he read from his notes, and thus, if anyone had kicked defendant or knocked him to the ground, he would not be able to remember unless the incident had been recorded in one of those reports.

¶ 76 An affidavit from Detective Breska was admitted into evidence. It was substantially consistent with Rusnak's testimony in its account of events and denials of committing or witnessing any physical abuse of defendant.

¶ 77 ASA Peters testified that she was the felony-review attorney assigned to this case. Based on her review of the notes in her felony-review folder, Peters testified that she declined to approve charges against defendant on December 30, 1989. She further testified that, if defendant (or Johnson) had complained about being physically abused by the detectives or if there had been any visible signs of such abuse, she would have included that in her notes. There were no such notes in her folder.

¶ 78 The circuit court denied defendant relief, holding that defendant failed to show, by a preponderance of the evidence, that his statement to the police was coerced by police torture. The court found "most compelling" the dual facts that defendant waited so long to formally claim abuse and that his testimony (both before the TIRC and later the court) conflicted with regard to the sequencing of the abuse and the identity of the abusers. The court refused to draw an adverse inference from Detective Paladino's invocation of the fifth amendment when asked whether he tortured defendant because, in the court's view, there was "ample evidence to rebut defendant's claim of torture and abuse."

¶ 79 This appeal followed.

¶ 80 II. ANALYSIS
¶ 81 A. Adverse Inference
¶ 82 Defendant identified former Detective Paladino as one of the officers who physically abused and threatened him during his interrogations at Area 3, and former Sergeant Byrne as the supervising officer on the case, who also made a brief appearance in the interrogation room. Defense counsel called Paladino and Byrne to the stand. Both officers immediately invoked their fifth-amendment rights against self-incrimination and refused to answer any substantive questions about their respective roles in this investigation or their participation in

defendant's alleged abuse. For example, the following exchange took place between defendant's counsel and Detective Paladino:

> "Q. And at any time during Mr. James Gibson's interrogation or questioning as a suspect in a double homicide between December 27, 1989, and December 31, 1989, did you ever observe Mr. Gibson being beaten, punched, kicked, burnt or otherwise physically abused or coerced?
>
> A. I will stand by my rights under the Fifth Amendment of the constitution.
>
> Q. This last question—and during this period of December 27, 1989, to December 31, 1989, did you ever punch, kick, burn or otherwise physically abuse Mr. James Gibson?
>
> A. I will stand by my right under the Fifth Amendment of the Constitution."

¶ 83    Detective Paladino confirmed that he would not answer any questions regarding the investigation or interrogation of defendant. A substantially similar exchange occurred with Sergeant Byrne, who refused to answer any substantive questions regarding the investigation of interrogation of defendant.

¶ 84    The circuit court declined to draw an adverse inference against either officer. Defendant contends that it was error, in both instances, not to do so.

¶ 85    Judicial review of a TIRC disposition is a civil proceeding, "akin to" the third stage of a postconviction proceeding, which is also civil in nature. See *People v. Christian*, 2016 IL App (1st) 140030, ¶ 78; *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 106. In a civil action, the fifth amendment does not forbid an adverse inference against a party who refuses to testify in response to probative evidence of alleged misconduct. *Whirl*, 2015 IL App (1st) 111483, ¶ 106; *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 332 (1997); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). As long as there is "some" evidence to support the complainant's allegations, a court may consider a party's refusal to testify as further evidence of the alleged misconduct. *People v. Houar*, 365 Ill. App. 3d 682, 690 (2006).

¶ 86    While the circuit court may draw an adverse inference from a party's refusal to testify, it is not automatically required to do so. *Id.* at 689; *Whirl*, 2015 IL App (1st) 111483, ¶ 107. That said, the circuit court does not have unfettered—or unreviewable—discretion to decline a draw an adverse inference. To the contrary, as we held in *Whirl*, a failure to draw an adverse inference may be error, even though the inference is permissive, if there is no good reason why the inference should not have been drawn. See *Whirl*, 2015 IL App (1st) 111483, ¶ 107.

¶ 87    In *Whirl*, 2015 IL App (1st) 111483, ¶¶ 53-65, the defendant Whirl testified at his postconviction hearing that he was beaten and coerced into making a false confession at Area 2 by Detective James Pienta. Pienta was called to the stand. *Id.* ¶ 68. He was asked whether he tortured Whirl, whether he participated in the torture of several other suspects at Area 2, and whether incidents of police brutality and torture continued there after Burge was promoted and transferred to Area 3. *Id.* (By the time of Whirl's interrogation, Burge had already been transferred.) Pienta took the fifth and refused to answer these, or any other, substantive questions. *Id.* The parties stipulated that other detectives who could have been called to testify to alleged incidents of abuse at Area 2—including Paladino—also would have invoked their fifth-amendment rights. *Id.* The circuit court refused to draw an adverse inference. Because the State did not produce any evidence to rebut Whirl's claims, we found Pienta's assertion of the

privilege "significant" and thus held that "a negative inference should have been drawn" from it. *Id.* ¶ 107.

¶ 88 Here, the circuit court distinguished *Whirl* on the ground that the State produced "ample" evidence to rebut defendant's allegations of abuse. To properly assess this conclusion, we must isolate defendant's various allegations.

¶ 89 We first briefly address the "claim" that Sergeant Byrne threatened defendant with a gun on December 30, 1989. Although the lawyers on each side argue about this claim, we do not read defendant's testimony as claiming that Byrne threatened him with a gun. Rather, defendant testified at the post-TIRC hearing that, at one point during his interrogation on December 30, Sergeant Byrne entered the interrogation room, placed a gun on the table, and asked defendant if that gun was the weapon used to commit the murders. Defendant did not testify that he was threatened, or that he felt threatened, in any way by that gesture. So to the extent that the State rings up this claim as some newfound allegation of abuse, appearing for the first time in defendant's testimony at the post-TIRC hearing—and thus a hit on defendant's overall credibility—we see it otherwise. Defendant has never claimed that Sergeant Byrne actively participated in the abuse.

¶ 90 That aside, defendant's allegations of torture can be lumped into two different categories: (1) the beatings he claims he suffered and (2) the burn on his arm, supposedly administered by Detective Maslanka. We start with the general allegations of slapping, kicking, and punching.

¶ 91 We cannot agree with the circuit court that "ample evidence" existed to rebut defendant's claims of physical abuse insofar as he claimed that the police punched, slapped, and kicked him repeatedly. A review of the evidence shows that none of the testifying detectives rebutted defendant's claims in any meaningful way.

¶ 92 Detective Moser testified that he had a "short conversation" with defendant, and one other detective whom he did not name, on December 30, 1989. "During *that* conversation," he testified (emphasis added), nobody in his presence struck or threatened defendant, but he "ha[d] no idea what happened on the 27th, 28th, 29th." Thus, he had no personal knowledge whether, as defendant testified, he was beaten repeatedly during an interrogation on December 29.

¶ 93 Leja had no memory at all of this investigation. Based on the reports he reviewed, he was able to testify that, apparently, he conducted some field interviews near the scene of the murders, but that was all. He never testified to participating in, witnessing, or even being present at Area 3 during any interrogation of defendant.

¶ 94 Like Leja, Rusnak testified that he had no independent memory of the case and that his recollection was limited to his notes; thus, if anyone had kicked defendant or knocked him to the ground, he would not remember it unless it was recorded in his notes (which it was not). In any event, Rusnak testified that he and his partner, Breska, had a short conversation with defendant on the morning of December 29, 1989, in which they asked defendant if he would agree to take a polygraph exam. Defendant did not agree until sometime later that day. When he did, they came back to drive him to the exam, which was administered at another station. Rusnak denied witnessing any abuse of defendant.

¶ 95 Breska's affidavit, which the circuit court did not mention, was the same, in all essentials, as Rusnak's testimony.

- 14 -

¶ 96    And Caesar testified that he was first assigned to this investigation on December 31, 1989—after defendant's alleged abuse had ceased and he had (temporarily) been released from Area 3. Caesar testified that his role in the investigation was limited to Johnson. He was not present for any interview of defendant, he never spoke to defendant, and he never even saw defendant at Area 3. Thus, Caesar could not possibly rebut defendant's allegations. (Ironically, the circuit court seemed to explain this very point during a sidebar. The State had asked Caesar, during its direct examination, whether he saw Byrne pull out a gun in front of defendant. Caesar answered "no." This line of questioning, the circuit court explained, was "one of those things that's somewhat gilding the lily. If you never saw the person, you couldn't possibly have abused the person.")

¶ 97    ASA Peters testified that there was no note in her felony-review folder that defendant complained of physical abuse or that she observed any visible signs of abuse. It is unclear how Peters would have been able to observe any swelling or bruises that may have been present on defendant's torso, as they would have been obscured by his shirt. And while defendant may not have alleged any abuse when Peters interviewed him, neither did Whirl when the ASA interviewed him at the station. *Whirl*, 2015 IL App (1st) 111483, ¶ 20. If anything, defendant's omission is even less meaningful than Whirl's since the ASA testified that he met with Whirl alone (*id.*), while Peters testified that Detective Foley was in the room when she interviewed defendant. Defendant's reticence in these circumstances hardly "rebuts" his allegations.

¶ 98    In sum, none of the testifying detectives claimed to be present for the interrogations during which Paladino and others allegedly struck defendant. Indeed, these were not the detectives whom defendant accused of beating him alongside Paladino. And they were not the detectives listed in the police reports as interrogating defendant at the same time as Paladino. In refusing to draw an adverse inference, the circuit court misunderstood what the testimony of the other detectives could—and could not—rebut.

¶ 99    To put a finer point on it: On his TIRC claim form, defendant alleged that Paladino, Maslanka, McCann, "and several others" hit, kicked, and burned him. At the post-TIRC hearing under review here, defendant named Paladino, Maslanka, O'Mara, Collins, and Ptak as principally administering the abuse, and to a far lesser and more isolated extent Rusnak and Breska (while removing defendant from the polygraph room after his tantrum there). His testimony also indicated that Caesar and Byrne were present at some point in time in the interrogation room, though he never accused either of them of participating in the physical abuse.

¶ 100   Maslanka, O'Mara, Collins, and Ptak are deceased. Obviously, none of those detectives, principally charged with committing the abuse, rebutted defendant's testimony. That left Paladino, who was asked not only whether he, himself, inflicted physical abuse on defendant, but whether he witnessed any abuse by another officer or detective. He invoked the fifth amendment.

¶ 101   And while defendant never testified that Sergeant Byrne personally inflicted physical abuse, we know this much: Sergeant Byrne confirmed on defendant's OPS complaint that he was the supervising detective on the case; Sergeant Byrne was one of the officers who arrested defendant; and at least according to defendant, Sergeant Byrne entered the interrogation room on December 30, put a gun down on the table, and asked defendant if that gun was the weapon defendant used to commit a double murder. So defendant had at least a good-faith basis to believe that, if the detectives under him were physically beating defendant, Sergeant Byrne

- 15 -

would have known as much. But when asked, Byrne did not claim a lack of memory or deny that fact; he invoked the fifth amendment, too.

¶ 102   So the one detective who clearly had personal knowledge of defendant's claims took the fifth, and the sergeant who at least potentially would have such knowledge did the same. The other detectives were not in the room and/or lacked any memory of the case. That is hardly a "rebuttal" of defendant's claims.

¶ 103   The circuit court's final comment on the evidence "rebutting" defendant's claims of physical abuse were the detectives' supposed denials "that they ever heard of anybody [being] physically coerced" during Burge's tenure as the violent crimes commander at Area 3. This does not accurately state the testimony of any witness; in fact, when defense counsel posed precisely this question to Moser, the circuit court sustained the State's objection that it called for hearsay.

¶ 104   For these reasons, it was error for the trial court not to draw the adverse inference that Detective Paladino, and other detectives working with him, physically abused defendant prior to his inculpatory statement. See *Whirl*, 2015 IL App (1st) 111483, ¶ 107.

¶ 105   Paladino's status as a law enforcement officer should lend special significance to his invocation of the fifth-amendment privilege. A police officer, no less than a prosecutor, is a "servant of the law," whose first obligation is not to arrest people or secure confessions but to see "that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). It is no overstatement to say that the integrity of our justice system is dependent on the integrity of our police officers. We depend on them complying with the law and the Constitution when doing their jobs—as most of them do most of the time.

¶ 106   And that is never truer than in the context of physically coerced confessions. While many errors might affect the fairness of a trial, the law reserves a special place for physically coerced confessions, not only because they pervert the truth-seeking function but because they undermine the overall integrity of the trial process. As our supreme court favorably quoted Justice White:

> "[T]he use of coerced confessions, 'whether true or false,' is forbidden 'because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused of his own mouth,' [citations]. This reflects the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' [citation] as well as 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminal as from the actual criminals themselves,' [citation]. Thus, permitting a coerced confession to be part of the evidence on which a jury is free to base its verdict of guilty is inconsistent with the thesis that ours is not an inquisitorial system of criminal justice." (Internal quotation marks omitted.) *People v. Wrice*, 2012 IL 111860, ¶ 70 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 293-94 (1991) (White, J., dissenting)).

¶ 107   Obtaining confessions by physical abuse "constitutes an egregious violation of an underlying principle of our criminal justice system about which Justice White spoke—'that

- 16 -

ours is an accusatorial and not an inquisitorial system.' " *Id.* ¶ 73 (quoting *Fulminante*, 499 U.S. at 293 (White, J., dissenting)). Thus, no matter how strong the case against a particular defendant may otherwise be, our supreme court has remained steadfast in holding that the "use of a defendant's physically coerced confession as substantive evidence of his guilt is never harmless error." *Id.* ¶ 84.

¶ 108　　So when, in the face of a credible allegation, an officer of the court is unwilling to assure the court that he and his colleagues did *not* physically coerce a confession, when he determines that a truthful answer could subject him to criminal liability, the court should take careful note. Here, because most of the witnesses disclaimed any ability to directly address the allegations of abuse and the only material witnesses capable of so rebutting asserted his fifth-amendment rights, it was error not to draw an adverse inference.

¶ 109　　　　　　　　　　　　　　　B. Harmless Error

¶ 110　　Our next question is whether that error was harmless. A nonconstitutional error is harmless only if there is no reasonable probability that it affected the outcome of the hearing. See *In re E.H.*, 224 Ill. 2d 172, 180 (2006).

¶ 111　　In its decision to deny relief below, the circuit court identified as "most compelling" two major concerns with defendant's testimony. The first was how long it took defendant to press these claims. The second was the defendant's shifting testimony as to which detectives committed which abuse at what time—most notably, defendant's rather recent claim of being burned by Detective Maslanka.

¶ 112　　First, the trial court found that defendant's allegations of abuse were not credible because he had failed to allege them in prior court proceedings over the years. But defendant's allegations did not come out of the blue. Apart from immediately telling his sister, OPS, his bond-court attorney, and doctors at Cermak Hospital, defendant testified that he told his trial attorney that he was abused by the police. The trial court at the post-TIRC hearing evidently did not believe this testimony, since defendant did not move to suppress his statement on these grounds. Instead, trial counsel filed a boilerplate motion to quash defendant's arrest as lacking probable cause, and defendant filed a *pro se* supplemental motion to suppress Johnson's confession as coerced.

¶ 113　　But a closer look at the pretrial proceedings demonstrates that defendant's claims have far more merit than the trial court credited. There is ample reason to think that the focus of the pretrial motions was the result of trial counsel's ineffectiveness. As we recounted previously (see *supra* ¶¶ 16, 22-24), the record clearly shows that defendant's public defender believed that there was no basis or need to suppress defendant's statement to the police, as he believed it to be exculpatory—it placed defendant at the scene merely as a bystander, not a shooter or accomplice—and thus that it was both helpful to the defense and inadmissible under the hearsay rules as either a statement against interest or a party-opponent's admission.

¶ 114　　Misadvised by his attorney that his own statements were not subject to suppression, defendant moved to suppress Johnson's statement instead—a statement that *did* directly implicate defendant in the murder—and left his own statement utterly unchallenged. In a twist of bitter irony, Johnson's statement was never admitted at defendant's trial (because Johnson refused to testify at defendant's trial and was thus not subject to cross-examination), while defendant's supposedly "exculpatory" statement ended up being the lynchpin of his conviction in the eyes of the trial judge.

¶ 115    After defendant was convicted, he fired his public defender and retained new counsel to represent him on a motion for new trial. Defendant testified at the post-TIRC hearing that he told his posttrial counsel about his abuse. Counsel told him, however, that he was unable to locate the bond-court photos or medical records from Cermak Hospital, and that without any evidence to corroborate defendant's allegations, he could not allege in a pleading that defendant's statement was the product of police abuse. Indeed, defendant testified that he had tried for over two decades to obtain this evidence, and letters from Cermak Hospital denying his requests as late as 2012 attest to his inability to do so.

¶ 116    In the motion for new trial, posttrial counsel thus alleged that the trial court erred in admitting a "purported statement of the defendant, which was neither a confession, nor admission of culpability." Dissatisfied with this approach, defendant filed a *pro se* supplemental motion, in which he "allege[d] that he did not have an Evidentiary Hearing, in that the State allowed Officer Moser to testify to an alleged statement made by the defendant." On cross-examination at the post-TIRC evidentiary hearing, the State questioned defendant about his failure to allege in this context that he had been abused by the police. Defendant testified that "I was trying to get it in there," but as he understood the advice of his attorney, "I couldn't mention my statement because I didn't have any evidence." Later, defendant reiterated, "I never got a chance to put the coercion in there because we didn't have any evidence. I was trying to get in there some way that we could have a hearing to determine why my statement was made and admitted into evidence in the first place." And as defendant noted, in all fairness, "I am not a lawyer. I didn't know what I was doing."

¶ 117    Defendant, in short, did everything he thought he could do, consistent with the advice of his attorneys, to challenge his statement during his original trial proceedings. Given this record, we cannot accept the circuit court's assertion that defendant simply remained mum for decades before opportunistically conjuring abuse allegations after the Burge scandal came to light.

¶ 118    The trial court's other reason for questioning the credibility of defendant's testimony was that "his testimony before the TIRC and this court not only conflicts regarding names of the police officers but their presence at times, description, and acts, specifically he never mentioned the alleged burning."

¶ 119    The circuit court's concern with defendant's testimony about Detective Maslanka burning him on the forearm was understandable. It is true, on the one hand, that from the first time that defendant recounted his abuse in writing—the 2011 clemency petition—onward, he has claimed that he was burned by Detective Maslanka, and both defendant's sister and niece testified that they saw a burn mark on defendant's arm when he was first released from police custody on December 30, 1989. But on the other hand, it is also true that the contemporaneous evidence of defendant's abuse—his OPS complaint, photographs taken on the order of Judge Bastone, and hospital records—reveal nothing about a burn on defendant's arm. The evidence is sufficiently conflicting that we would not disturb the circuit court's credibility finding on this question of the burn injury.

¶ 120    But we can go no further in crediting the circuit court's findings on the evidence. While there is no question that the details of defendant's testimony varied, there is likewise no question that the core allegations have remained the same: a group of detectives, including Paladino and Maslanka, repeatedly slapped, punched, and kicked him, primarily in his chest.

¶ 121     Defendant may have varied the order of the alleged events from one forum to the next—perhaps Paladino initiated the abuse by slapping him, and Maslanka kicked him later; or perhaps it was the other way around—but more than a quarter-century later, we would not expect defendant to recall such fine-grained details of a beating. And maybe he was never sure, to begin with, exactly who threw which punch, slap, or kick in what order. It does not strike us implausible that someone experiencing a stressful encounter would struggle to keep those kinds of facts straight, not immediately afterward and certainly not decades later.

¶ 122     Similarly, the circuit court emphasized that defendant was not consistent from one forum to the next as to which officers participated with Paladino and Maslanka in the alleged abuse. At the evidentiary hearing, he testified that they were joined by O'Mara, Collins, and Ptak; in his TIRC deposition, he said Caesar and McCann. But defendant has made two things abundantly clear.

¶ 123     First, he has never claimed that he knew the identity of his alleged abusers when he was at Area 3. His OPS complaint stated that "at least two" "unknown" officers beat him. He gave the names of O'Mara and Collins because they had previously visited defendant's home and left their business cards. And defendant testified at the hearing that the detectives were in plainclothes, did not display their stars, and did not tell him their names. It was not until defendant could retrospectively piece together the events at Area 3, with the benefit of the police reports, that he began to identify his alleged abusers. (And the police reports show that O'Mara, Collins, and Ptak participated with Paladino and Maslanka in defendant's interrogations on December 29, 1989.)

¶ 124     Second, defendant was candid, throughout his testimony, that he sometimes confuses the various detectives in recounting these events, in part because his recollections are not always crystal clear so many years later and in part due to the large number of detectives who were involved in his interrogations and moving in and out of the room. Indeed, during the post-TIRC hearing, defendant often mispronounced names—"Malanski" or "Matalanski" for Maslanka, "Padolis" for Paladino—and sometimes referred to people as the "tall" guy or the "short" guy or "the sarge—the one with the juice."

¶ 125     These variations in defendant's accounts do not strike us as anything out of the ordinary. Disparities in fine-grained detail are routinely present in witness's accounts, particularly those of stressful events. We do not dispute that the circuit court was entitled to consider inconsistencies in defendant's statements in assessing his overall credibility; we note only that the evidence was much more closely balanced than the circuit court found. The drawing of an adverse inference could have changed the outcome of the hearing. The error could not be harmless. We reverse the circuit court's judgment and remand for further proceedings consistent with this opinion.

¶ 126     We will not go as far as defendant would ask and order his release or a new trial at this juncture. The circuit court should have the first opportunity to consider all the evidence, along with the properly-drawn adverse inference, to ultimately determine whether its doubts about defendant's credibility remain, and whether such doubts warrant a denial of relief.

¶ 127                         C. Illinois Rules of Evidence

¶ 128     In light of our disposition above, we need not reach many of the other issues defendant raises on appeal. But there is one question of law, embedded in several of his arguments, that will necessarily arise in any future evidentiary hearing on a claim referred to the circuit court

from the TIRC: Given that the Illinois Rules of Evidence (Rules) do not apply to "postconviction hearings" (Ill. R. Evid. 1101(b)(3) (amended Apr. 8, 2013)), do the Rules apply at an evidentiary hearing on a claim referred from the TIRC? Our answer is no.

¶ 129    The Rules were enacted by our supreme court. Ill. S. Ct., M.R. 24138 (eff. Jan. 1, 2011). Thus, the rules of statutory construction apply. *In re Michael D.*, 2015 IL 119178, ¶ 9. Whether we are construing a statute or a rule, our primary goal is the same: to discern the intent of the drafters. *Id.* The most reliable indicator of intent is the plain and ordinary meaning of the statute or rule. *Id.* "Each word, clause, or sentence of a statute [or rule] must be given a reasonable meaning, if possible, and should not be rendered superfluous." *People v. Jackson*, 2011 IL 110615, ¶ 12. We may consider the reason(s) for the law, and the consequences of construing it one way or another; and we are to presume that absurd, inconvenient, or unjust results were not intended. *Id.* Statutes (and rules) that bear on the same subject should be construed together and "in harmony with each other, if reasonably possible." *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 52 (1990). The construction of a statute (or rule) is a question of law that we review *de novo*. *Jackson*, 2011 IL 110615, ¶ 12.

¶ 130    Rule 1101(a) provides that the Rules "govern proceedings in the courts of Illinois," except as otherwise provided in Rule 1101. Ill. R. Evid. 1101(a) (eff. Apr. 8, 2013). Subsection (b)(3) exempts "postconviction hearings" from the Rules. Ill. R. Evid. 1101(b) (eff. Apr. 8, 2013). It does not, as the State points out, separately list evidentiary hearings on claims referred to the circuit court from TIRC—what the Act calls "post-commission judicial review." See 775 ILCS 40/50 (West 2014). And the Act was passed in 2009, well before the 2013 amendment that exempted postconviction hearings from the purview of the Rules.

¶ 131    The State's argument thus rests on the principle that the enumeration of one thing in a statute implies the exclusion of others. See, *e.g.*, *Baker v. Miller*, 159 Ill. 2d 249, 260 (1994). Because this rule of statutory construction is not a rule of law, it may be overcome by a "strong indication of contrary legislative intent." *Id.* The State's application of the principle may appear sound when Rule 1103 is read in isolation, but for several reasons, we disagree with the State's interpretation.

¶ 132    First, we are unable to reconcile the State's position with the plain language of the Act. Section 50 of the Act provides, "Notwithstanding the status of any *other* postconviction proceedings relating to the petitioner, if the court finds in favor of the petitioner, it shall enter an appropriate order [for such relief] as may be necessary and proper." (Emphasis added.) 775 ILCS 40/50(a) (West 2014). Similarly, section 55 provides that "[a] claim of torture asserted through the Commission shall not adversely affect the convicted person's rights to *other* postconviction relief." (Emphasis added.) 775 ILCS 40/55(b) (West 2014). We understand the General Assembly, in these provisions, to refer to a TIRC claim as one species of postconviction proceeding. We see no other way to give the word "other" in these provisions a reasonable meaning that does not render it superfluous. See *Jackson*, 2011 IL 110615, ¶ 12.

¶ 133    It would be one thing if Rule 1101 had narrowly exempted proceedings under the Post-Conviction Hearing Act (see 725 ILCS 5/122-1 *et seq.* (West 2014)); that would surely exclude proceedings under the Act. But Rule 1101 uses the more generic term "postconviction hearing," and we presume that the supreme court was fully aware of the General Assembly's description of a TIRC claim when it enacted the Rules. Thus, we conclude that the Rules do not apply at evidentiary hearings on claims arising under either act.

¶ 134    The State argues that this result conflicts with the Act because the Act specifically provides that in reviewing a claim referred by the TIRC, "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence." 775 ILCS 40/50(a) (West 2014). In the State's view, this provision shows that the legislature "clearly intended for the post-commission judicial review to be governed by some sort of rules." But the identical provision also appears in the Post-Conviction Hearing Act, and the Rules do not apply to proceedings under that act. 725 ILCS 5/122-6 (West 2014) ("The court may receive proof by affidavits, depositions, oral testimony, or other evidence."). So the State's argument proves nothing.

¶ 135    More generally, section 50(a) of the Act is taken, verbatim, from section 122-6 of the Post-Conviction Hearing Act, with only two exceptions: the first sentence of section 50(a), which describes the referral process; and the telling reference to "*other* postconviction proceedings." (Emphasis added.) 775 ILCS 40/50 (West 2014). We conclude that the legislature intended post-commission judicial review to be understood as a new species of postconviction proceeding.

¶ 136    Moreover, the State's position, if adopted, would have arbitrary, unfair, and confusing results. An evidentiary hearing on a claim of police torture might be held because the claim was referred by the TIRC, or because a petition under the Post-Conviction Hearing Act survived the State's motion to dismiss. We see no good reason why the evidence admissible at the hearing should depend on which of these remedies the petitioner invoked. Exempting a hearing from a strict application of the Rules obviously expands the range of evidence that the court may consider. It seems arbitrary and unfair to limit the evidence that a TIRC petitioner may present, relative to the evidence that a petitioner may present when pursuing relief under the Post-Conviction Hearing Act. Counterproductive, too: the General Assembly did not establish the TIRC because victims of police torture needed a remedy that was *harder* to secure than what they already had. Accepting the State's argument would take the "extraordinary" out of the "extraordinary procedure to investigate and determine factual claims of torture" that the General Assembly created. 775 ILCS 40/10 (West 2016).

¶ 137    And sometimes a petitioner—for instance, Whirl—will file a joint petition, under both acts, and the circuit court will hold a combined evidentiary hearing. See *Whirl*, 2015 IL App (1st) 111483, ¶¶ 50, 52. This is a prudent pleading procedure and an efficient use of judicial resources. The State's rule would plunge such hearings into needless confusion.

¶ 138    We thus hold that judicial review of a TIRC claim is a type of "postconviction hearing" within the meaning of Rule 1101(b)(3). The Illinois Rules of Evidence do not apply at those hearings.

¶ 139    It follows from this exemption that there is no general prohibition against hearsay at a "postconviction hearing," whether the hearing is conducted under the Act or the Post-Conviction Hearing Act. There are many other types of hearings at which the general prohibition against hearsay does not apply. See Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013). For example, sentencing hearings have long been exempt from the rules of evidence—in lowercase, since the exemption predates not only the 2013 amendment but the original codification of the Rules. See, *e.g.*, *People v. Meeks*, 81 Ill. 2d 524, 535 (1980); *People v. Spicer*, 379 Ill. App. 3d 441, 467 (2007). We have always left it "to the 'sound discretion' of the trial court to determine whether hearsay is reliable enough to weigh in sentencing." *Spicer*, 379 Ill. App. 3d at 467; *Meeks*, 81 Ill. 2d at 535 (evidence admissible at sentencing if deemed "accurate and reliable"). If the trial court finds hearsay evidence "relevant and reliable," the

fact that it is hearsay affects its weight, rather than its admissibility. *Spicer*, 379 Ill. App. 3d at 467; *People v. Harris*, 375 Ill. App. 3d 398, 409 (2007). The same rule applies at a suppression hearing (*People v. Patterson*, 192 Ill. 2d 93, 112 (2000)), where the trial court's inquiry overlaps significantly with the inquiry at an evidentiary hearing on a claim of police torture. In short, we routinely entrust trial judges with the discretion to decide whether hearsay evidence is reliable enough to be admitted at a hearing, and, if so, how much weight the hearsay evidence deserves. We do the same here.

¶ 140    The circuit court held that the Rules applied to defendant's evidentiary hearing. Thus, when defendant proffered hearsay evidence of various sorts, the circuit court held that defendant had to show that it fell within a recognized exception to the hearsay rule. None of defendant's proffered hearsay evidence was admitted. On remand, the circuit court should reconsider this proffered evidence in light of our holding here. But the circuit court remains free to assign the appropriate weight to whatever evidence it considers; admissibility does not equate to significant weight or probative value, as the circuit court recognized below.

¶ 141                                III. CONCLUSION

¶ 142    For the reasons given above, we reverse the circuit court's judgment denying defendant's claim and remand for further proceedings consistent with this opinion.

¶ 143    Reversed and remanded.